PANAMA REFINING CO. ET AL. *v.* RYAN ET AL.

AMAZON PETROLEUM CORP. ET AL. *v.* RYAN ET AL.

Nos. 135 and 260. Argued December 10, 11, 1934.—Decided January 7, 1935.

390 .

*Messrs. James N. Saye* and *F. W. Fischer,* with whom *Mr. W. Edward Lee* was on the brief, for petitioners in No. 260.

*Mr. F. S. Fischer* for petitioner in No. 135.

*Assistant Attorney General Stephens* and *Mr. L. T. Martineau, Jr.,* with whom *Solicitor General Biggs* and *Messrs. Carl McFarland, M. S. Huberman, Charles H. Weston, A. H. Feller, Nathan R. Margold,* and *Charles Fahy* were on the brief, for respondents.

400

402

404

Mr. Chief Justice Hughes delivered the opinion of the Court.

On July 11, 1933, the President, by Executive Order, prohibited " the transportation in interstate and foreign commerce of petroleum and the products thereof produced or withdrawn from storage in excess of the amount permitted to be produced or withdrawn from storage by any State law or valid regulation or order prescribed thereunder, by any board, commission, officer, or other duly

authorized agency of a State." [1]   This action was based on § 9 (c) of Title I of the National Industrial Recovery Act of June 16, 1933, 48 Stat. 195, 200, 15 U. S. C. Tit. I, § 709 (c).   That section provides:

"Sec. 9 . . .

"(c) The President is authorized to prohibit the transportation in interstate and foreign commerce of petroleum and the products thereof produced or withdrawn from storage in excess of the amount permitted to be produced or withdrawn from storage by any state law or valid regulation or order prescribed thereunder, by any board, commission, officer, or other duly authorized agency of a State.   Any violation of any order of the President issued under the provisions of this subsection shall be punishable by fine of not to exceed $1,000, or imprisonment for not to exceed six months, or both."

On July 14, 1933, the President, by Executive Order, authorized the Secretary of the Interior to exercise all the powers vested in the President " for the purpose of en-

---

[1] The full text of the Executive Order of July 11, 1933, is as follows:

" EXECUTIVE ORDER

" *Prohibition of Transportation in Interstate and Foreign Commerce of Petroleum and the Products thereof unlawfully produced or withdrawn from storage.*

" By virtue of the authority vested in me by the Act of· Congress entitled 'AN ACT To encourage national industrial recovery, to foster fair competition, and to provide for the construction of certain useful public works, and for other purposes,' approved June 16, 1933, (Public No. 67, 73d Congress), the transportation in interstate and foreign commerce of petroleum and the products thereof produced or withdrawn from storage in excess of the amount permitted to be produced or withdrawn from storage by any State law or valid regulation or order prescribed thereunder, by any board, commission, officer, or other duly authorized agency of a State, is hereby prohibited.

FRANKLIN D. ROOSEVELT."

" The White House,
        July 11, 1933,"

forcing Section 9 (c) of said act and said order" of July 11, 1933, " including full authority to designate and appoint such agents and to set up such boards and agencies as he may see fit, and to promulgate such rules and regulations as he may deem necessary." [2]  That order was made under § 10 (a) of the National Industrial Recovery Act, 48 Stat. 200, 15 U. S. C. 710 (a), authorizing the President " to prescribe such rules and regulations as may be necessary to carry out the purposes" of Title I of the National Industrial Recovery Act and providing that " any violation of any such rule or regulation shall be punishable by fine of not to exceed $500, or imprisonment for not to exceed six months, or both."

On July 15, 1933, the Secretary of the Interior issued regulations to carry out the President's orders of July 11 and 14, 1933.  These regulations were amended by orders

---

[2] The Executive Order of July 14, 1933, is as follows:

" EXECUTIVE ORDER

" *Prohibition of Transportation in Interstate and Foreign Commerce of Petroleum and the Products thereof unlawfully produced or withdrawn from storage.*

" By virtue of the authority vested in me by the Act of Congress entitled 'AN ACT To encourage national industrial recovery, to foster fair competition, and to provide for the construction of certain useful public works, and for other purposes,' approved June 16, 1933, (Public No. 67, 73d Congress), in order to effectuate the intent and purpose of the Congress as expressed in Section 9 (c) thereof, and for the purpose of securing the enforcement of my order of July 11, 1933, issued pursuant to said act, I hereby authorize the Secretary of the Interior to exercise all the powers vested in me, for the purpose of enforcing Section 9 (c) of said act and said order, including full authority to designate and appoint such agents and to set up such boards and agencies as he may see fit, and to promulgate such rules and regulations as he may deem necessary.

FRANKLIN D. ROOSEVELT."

" The White House,
          July 14, 1933."

of July 25, 1933, and August 21, 1933, prior to the commencement of these suits. Regulation IV provided, in substance, that every producer of petroleum should file a monthly statement under oath, beginning August 15, 1933, with the Division of Investigations of the Department of the Interior, giving information with respect to the residence and post-office address of the producer, the location of his producing properties and wells, the allowable production as prescribed by state authority, the amount of daily production, all deliveries of petroleum, and declaring that no part of the petroleum or products produced and shipped had been produced or withdrawn from storage in excess of the amount permitted by state authority. Regulation V required every purchaser, shipper (other than a producer), and refiner of petroleum, including processors, similarly to file a monthly statement under oath, giving information as to residence and post-office address, the place and date of receipt, the parties from whom and the amount of petroleum received and the amount held in storage, the disposition of the petroleum, particulars as to deliveries, and declaring, to the best of the affiant's information and belief, that none of the petroleum so handled had been produced or withdrawn from storage in excess of that allowed by state authority. Regulation VII provided that all persons embraced within the terms of § 9 (c) of the Act, and the Executive Orders and regulations issued thereunder, should keep " available for inspection by the Division of Investigations of the Department of the Interior adequate books and records of all transactions involving the production and transportation of petroleum and the products thereof."

On August 19, 1933, the President, by Executive Order, stating that his action was taken under Title I of the National Industrial Recovery Act, approved a " Code of

Fair Competition for the Petroleum Industry." [3] By a further Executive Order of August 28, 1933, the President designated the Secretary of the Interior as Administrator, and the Department of the Interior as the Federal Agency, to exercise on behalf of the President all the powers vested in him under that Act and Code. Section 3 (f) of Title I of the National Industrial Recovery Act provides that when a code of fair competition has been approved or prescribed by the President under that title, " any violation of any provision thereof in any transaction in or affecting interstate or foreign commerce shall

---

[3] The Executive Order of August 19, 1933, is as follows:

" EXECUTIVE ORDER

" *Code of Fair Competition for the Petroleum Industry.*

"An application having been duly made, pursuant to and in full compliance with the provisions of Title I of the National Industrial Recovery Act, approved June 16, 1933, for my approval of a Code of Fair Competition for the Petroleum Industry, and hearings having been held thereon and the Administrator having rendered his report together with his recommendations and findings with respect thereto, and the Administrator having found that the said Code of Fair Competition complies in all respects with the pertinent provisions of Title I of said Act and that the requirements of clauses (1) and (2) of subsection (a) of Section 3 of the said Act have been met:

" Now, THEREFORE, I, Franklin D. Roosevelt, President of the United States, pursuant to the authority vested in me by Title I of the National Industrial Recovery Act, approved June 16, 1933, and otherwise, do adopt and approve the report, recommendations and findings of the Administrator and do order that the said Code of Fair Competition be and it is hereby approved.

FRANKLIN D. ROOSEVELT."

"Approval Recommended:
    HUGH S. JOHNSON,
            *Administrator.*
" The White House,
        August 19, 1933."

be a misdemeanor, punishable by fine of not more than $500 for each offense, each day of said violation to be deemed a separate offense."

This "Petroleum Code" (in its original form and as officially printed) provided in § 3 of Article III relating to "Production," for estimates of "required production of crude oil to balance consumer demand for petroleum products" to be made at intervals by the Federal Agency. This "required production" was to be "equitably allocated" among the several States. These estimates and allocations, when approved by the President, were to be deemed to be "the net reasonable market demand," and the allocations were to be recommended "as the operating schedules for the producing States and for the industry." By § 4 of Article III, the subdivision, with respect to producing properties, of the production allocated to each State, was to be made within the State. The second paragraph of that section further provided:

"If any subdivision into quotas of production allocated to any State shall be made within a State any production by any person, as person is defined in Article I, Section 3 of this code, in excess of any such quota assigned to him, shall be deemed an unfair trade practice and in violation of this code."

By an Executive Order of September 13, 1933, modifying certain provisions of the Petroleum Code, this second paragraph of § 4 of Article III was eliminated. It was reinstated by Executive Order of September 25, 1934.

These suits were brought in October, 1933.

In No. 135, the *Panama Refining Company*, as owner of an oil refining plant in Texas, and its co-plaintiff, a producer having oil and gas leases in Texas, sued to restrain the defendants, who were federal officials, from enforcing Regulations IV, V and VII prescribed by the Secretary of the Interior under § 9 (c) of the National Industrial

Recovery Act. Plaintiffs attacked the validity of § 9 (c) as an unconstitutional delegation to the President of legislative power and as transcending the authority of the Congress under the commerce clause. The regulations, and the attempts to enforce them by coming upon the properties of the plaintiffs, gauging their tanks, digging up pipe lines, and otherwise, were also assailed under the Fourth and Fifth Amendments of the Constitution.

In No. 260, the *Amazon Petroleum Corporation,* and its co-plaintiffs, all being oil producers in Texas and owning separate properties, sued to enjoin the Railroad Commission of that State, its members and other state officers, and the other defendants who were federal officials, from enforcing the state and federal restrictions upon the production and disposition of oil. The bill alleged that the legislation of the State and the orders of its commission in curtailing production violated the Fourteenth Amendment of the Federal Constitution. As to the federal requirements, the bill not only attacked § 9 (c) of the National Industrial Recovery Act, and the regulations of the Secretary of the Interior thereunder, upon substantially the same grounds as those set forth in the bill of the *Panama Refining Company,* but also challenged the validity of provisions of the Petroleum Code. While a number of these provisions were set out in the bill, the contest on the trial related to the limitation of production through the allocation of quotas pursuant to § 4 of Article III of the Code.

As the case involved the constitutional validity of orders of the state commission and an interlocutory injunction was sought, a court of three judges was convened under § 266 of the Judicial Code (28 U. S. C. 380). That court decided that the cause of action against the federal officials was not one within § 266 but was for the consideration of the District Judge alone. The parties agreed that the causes of action should be severed and that each cause

should be submitted to the tribunal having jurisdiction of it. Hearing was had both on the applications for interlocutory injunction and upon the merits. The court of three judges, sustaining the state orders, denied injunction and dismissed the bill as against the state authorities. 5 F. Supp. 633, 634, 639.

In both cases against the federal officials, that of the *Panama Refining Co.* and that of the *Amazon Petroleum Corp.*, heard by the District Judge, a permanent injunction was granted. 5 F. Supp. 639. In the case of the *Amazon Petroleum Corp.*, the court specifically enjoined the defendants from enforcing § 4 of Article III of the Petroleum Code, both plaintiffs and defendants, and the court, being unaware of the amendment of September 13, 1933.

The Circuit Court of Appeals reversed the decrees against the federal officials and directed that the bills be dismissed. 71 F. (2d) 1, 8. The cases come here on writs of certiorari granted on October 8, 1934.

*First.* The controversy with respect to the provision of § 4 of Article III of the Petroleum Code was initiated and proceeded in the courts below upon a false assumption. That assumption was that this section still contained the paragraph (eliminated by the Executive Order of September 13, 1933) by which production in excess of assigned quotas was made an unfair practice and a violation of the Code. Whatever the cause of the failure to give appropriate public notice of the change in the section, with the result that the persons affected, the prosecuting authorities, and the courts, were alike ignorant of the alteration, the fact is that the attack in this respect was upon a provision which did not exist. The Government's announcement that, by reason of the elimination of this paragraph, the Government " cannot, and therefore it does not intend to, prosecute petitioners or other producers of oil in Texas, criminally or otherwise,

for exceeding, at any time prior to September 25, 1934, the quotas of production assigned to them under the laws of Texas," but that if " petitioners, or other producers, produce in excess of such quotas after September 25, 1934, the Government intends to prosecute them," cannot avail to import into the present case the amended provision of that date.[4] The case is not one where a subsequent law is applicable to a pending suit and controls its disposition.[5] When this suit was brought, and when it was heard, there was no cause of action for the injunction sought with respect to the provision of § 4 of Article III of the Code; as to that, there was no basis for real controversy. See *California* v. *San Pablo,* 149 U. S. 308, 314; *United States* v. *Alaska Steamship Co.,* 253 U. S. 113, 116; *Barker Co.* v. *Painters' Union,* 281 U. S. 462. If the Government undertakes to enforce the new provision, the petitioners, as well as others, will have an opportunity to present their grievance, which can then be considered, as it should be, in the light of the facts as they will then appear.

For this reason, we pass to the other questions presented and we express no opinion as to the interpretation or validity of the provisions of the Petroleum Code.

*Second.* Regulations IV, V and VII, issued by the Secretary of the Interior prior to these suits, have since been amended. But the amended regulations continue sub-

---

[4] The Government states that although the second paragraph of § 4 of Article III was a part of the Code for a short period prior to September 13, 1933, no legal basis exists for prosecution for production in Texas during that period.

[5] See *United States* v. *The Schooner Peggy,* 1 Cranch 103, 109, 110; *Dinsmore* v. *Southern Express Co.,* 183 U. S. 115, 120; *Crozier* v. *Krupp,* 224 U. S. 290, 302; *Gulf, C. & S. F. Ry. Co.* v. *Dennis,* 224 U. S. 503, 507; *Watts, Watts & Co.* v. *Unione Austriaca,* 248 U. S. 9, 21; *Duplex Printing Press Co.* v. *Deering,* 254 U. S. 443, 464; *American Steel Foundries* v. *Tri-City Council,* 257 U. S. 184, 201; *Texas Co.* v. *Brown,* 258 U. S. 466, 474.

stantially the earlier requirements, and expand them. They present the same constitutional questions, and the cases as to these are not moot. *Southern Pacific Co. v. Interstate Commerce Comm'n,* 219 U. S. 433, 452; *Southern Pacific Terminal Co. v. Interstate Commerce Comm'n,* 219 U. S. 498, 514–516; *McGrain v. Daugherty,* 273 U. S. 135, 181, 182.

The original regulations of July 15, 1933, as amended July 25, 1933, and August 21, 1933, were issued to enforce the Executive Orders of July 11 and July 14, 1933. The Executive Order of July 11, 1933, was made under § 9 (c) of the National Industrial Recovery Act, and the Executive Order of July 14, 1933, under § 10 (a) of that Act, authorizing the Secretary of the Interior to promulgate regulations, was for the purpose of enforcing § 9 (c) and the Executive Order of July 11, 1933. The amended regulations have been issued for the same purpose. The fundamental question as to these regulations thus turns upon the validity of § 9 (c) and the executive orders to carry it out.

*Third.* The statute provides that any violation of any order of the President issued under § 9 (c) shall be punishable by fine of not to exceed $1,000, or imprisonment for not to exceed six months, or both. We think that these penalties would attach to each violation, and in this view the plaintiffs were entitled to invoke the equitable jurisdiction to restrain enforcement, if the statute and the executive orders were found to be invalid. *Philadelphia Co. v. Stimson,* 223 U. S. 605, 620, 621; *Terrace v. Thompson,* 263 U. S. 197, 214–216; *Hygrade Provision Co. v. Sherman,* 266 U. S. 497, 499, 500.

*Fourth.* Section 9 (c) is assailed upon the ground that it is an unconstitutional delegation of legislative power. The section purports to authorize the President to pass a prohibitory law. The subject to which this authority relates is defined. It is the transportation in interstate and

foreign commerce of petroleum and petroleum products which are produced or withdrawn from storage in excess of the amount permitted by state authority. Assuming for the present purpose, without deciding, that the Congress has power to interdict the transportation of that excess in interstate and foreign commerce, the question whether that transportation shall be prohibited by law is obviously one of legislative policy. Accordingly, we look to the statute to see whether the Congress has declared a policy with respect to that subject; whether the Congress has set up a standard for the President's action; whether the Congress has required any finding by the President in the exercise of the authority to enact the prohibition.

Section 9 (c) is brief and unambiguous. It does not attempt to control the production of petroleum and petroleum products within a State. It does not seek to lay down rules for the guidance of state legislatures or state officers. It leaves to the States and to their constituted authorities the determination of what production shall be permitted. It does not qualify the President's authority by reference to the basis, or extent, of the State's limitation of production. Section 9 (c) does not state whether, or in what circumstances or under what conditions, the President is to prohibit the transportation of the amount of petroleum or petroleum products produced in excess of the State's permission. It establishes no criterion to govern the President's course. It does not require any finding by the President as a condition of his action. The Congress in § 9 (c) thus declares no policy as to the transportation of the excess production. So far as this section is concerned, it gives to the President an unlimited authority to determine the policy and to lay down the prohibition, or not to lay it down, as he may see fit. And disobedience to his order is made a crime punishable by fine and imprisonment.

416

We examine the context to ascertain if it furnishes a declaration of policy or a standard of action, which can be deemed to relate to the subject of § 9 (c) and thus to imply what is not there expressed. It is important to note that § 9 is headed "Oil Regulation,"—that is, § 9 is the part of the National Industrial Recovery Act which particularly deals with that subject matter. But the other provisions of § 9 afford no ground for implying a limitation of the broad grant of authority in § 9 (c). Thus § 9 (a) authorizes the President to initiate before the Interstate Commerce Commission "proceedings necessary to prescribe regulations to control the operations of oil pipe lines and to fix reasonable, compensatory rates for the transportation of petroleum and its products by pipe lines," and the Interstate Commerce Commission is to grant preference "to the hearings and determination of such cases." Section 9 (b) authorizes the President to institute proceedings "to divorce from any holding company any pipe-line company controlled by such holding company which pipe-line company by unfair practices or by exorbitant rates in the transportation of petroleum or its products tends to create a monopoly." It will be observed that each of these provisions contains restrictive clauses as to their respective subjects. Neither relates to the subject of § 9 (c).

We turn to the other provisions of Title I of the Act.

The first section is a "declaration of policy."[6] It declares that a national emergency exists "which is pro-

---

[6] The text of § 1 is as follows:

"Section 1. A national emergency productive of wide-spread unemployment and disorganization of industry, which burdens interstate and foreign commerce, affects the public welfare, and undermines the standards of living of the American people, is hereby declared to exist. It is hereby declared to be the policy of Congress to remove obstructions to the free flow of interstate and foreign commerce which tend to diminish the amount thereof; and to provide for the

ductive of widespread unemployment and disorganization of industry, which burdens interstate and foreign commerce, affects public welfare, and undermines the standards of living of the American people." It is declared to be the policy of Congress " to remove obstructions to the free flow of interstate and foreign commerce which tend to diminish the amount thereof "; " to provide for the general welfare by promoting the organization of industry for the purpose of coöperative action among trade groups "; " to induce and maintain united action of labor and management under adequate governmental sanctions and supervision "; " to eliminate unfair competitive practices, to promote the fullest possible utilization of the present productive capacity of industries, to avoid undue restriction of production (except as may be temporarily required), to increase the consumption of industrial and agricultural products by increasing purchasing power, to reduce and relieve unemployment, to improve standards of labor, and otherwise to rehabilitate industry and to conserve natural resources."

This general outline of policy contains nothing as to the circumstances or conditions in which transportation of petroleum or petroleum products should be prohibited,— nothing as to the policy of prohibiting, or not prohibiting, the transportation of production exceeding what the

general welfare by promoting the organization of industry for the purpose of coöperative action among trade groups, to induce and maintain united action of labor and management under adequate governmental sanctions and supervision, to eliminate unfair competitive practices, to promote the fullest possible utilization of the present productive capacity of industries, to avoid undue restriction of production (except as may be temporarily required), to increase the consumption of industrial and agricultural products by increasing purchasing power, to reduce and relieve unemployment, to improve standards of labor, and otherwise to rehabilitate industry and to conserve natural resources."

States allow. The general policy declared is " to remove obstructions to the free flow of interstate and foreign commerce." As to production, the section lays down no policy of limitation. It favors the fullest possible utilization of the present productive capacity of industries. It speaks, parenthetically, of a possible temporary restriction of production, but of what, or in what circumstances, it gives no suggestion. The section also speaks in general terms of the conservation of natural resources, but it prescribes no policy for the achievement of that end. It is manifest that this broad outline is simply an introduction of the Act, leaving the legislative policy as to particular subjects to be declared and defined, if at all, by the subsequent sections.

It is no answer to insist that deleterious consequences follow the transportation of " hot oil,"—oil exceeding state allowances. The Congress did not prohibit that transportation. The Congress did not undertake to say that the transportation of " hot oil " was injurious. The Congress did not say that transportation of that oil was " unfair competition." The Congress did not declare in what circumstances that transportation should be forbidden, or require the President to make any determination as to any facts or circumstances. Among the numerous and diverse objectives broadly stated, the President was not required to choose. The President was not required to ascertain and proclaim the conditions prevailing in the industry which made the prohibition necessary. The Congress left the matter to the President without standard or rule, to be dealt with as he pleased. The effort by ingenious and diligent construction to supply a criterion still permits such a breadth of authorized action as essentially to commit to the President the functions of a legislature rather than those of an executive or administrative

officer executing a declared legislative policy. We find nothing in § 1 which limits or controls the authority conferred by § 9 (c).

We pass to the other sections of the Act. Section 2 relates to administrative agencies which may be constituted. Section 3 provides for the approval by the President of " codes " for trades or industries. These are to be codes of " fair competition " and the authority is based upon certain express conditions which require findings by the President. Action under § 9 (c) is not made to depend on the formulation of a code under § 3. In fact, the President's action under § 9 (c) was taken more than a month before a petroleum code was approved. Subdivision (e) of § 3 authorizes the President, on his own motion or upon complaint, as stated, in case any article is being imported into the United States " in substantial quantities or increasing ratio to domestic production of any competitive article," under such conditions as to endanger the maintenance of a code or agreement under Title I, to cause an immediate investigation by the Tariff Commission. The authority of the President to act, after such investigation, is conditioned upon a finding by him of the existence of the underlying facts, and he may permit entry of the articles concerned upon such conditions and with such limitations as he shall find it necessary to prescribe in order that the entry shall not tend to render the code or agreement ineffective. Section 4 relates to agreements and licenses for the purposes stated. Section 5 refers to the application of the anti-trust laws. Sections 6 and 7 impose limitations upon the application of Title I, bearing upon trade associations and other organizations and upon the relations between employers and employees. Section 8 contains provisions with respect to the application of the Agricultural Adjustment Act of May 12, 1933.

None of these provisions can be deemed to prescribe any limitation of the grant of authority in § 9 (c).

*Fifth.* The question whether such a delegation of legislative power is permitted by the Constitution is not answered by the argument that it should be assumed that the President has acted, and will act, for what he believes to be the public good. The point is not one of motives but of constitutional authority, for which the best of motives is not a substitute. While the present controversy relates to a delegation to the President, the basic question has a much wider application. If the Congress can make a grant of legislative authority of the sort attempted by § 9 (c), we find nothing in the Constitution which restricts the Congress to the selection of the President as grantee. The Congress may vest the power in the officer of its choice or in a board or commission such as it may select or create for the purpose. Nor, with respect to such a delegation, is the question concerned merely with the transportation of oil, or of oil produced in excess of what the State may allow. If legislative power may thus be vested in the President, or other grantee, as to that excess of production, we see no reason to doubt that it may similarly be vested with respect to the transportation of oil without reference to the State's requirements. That reference simply defines the subject of the prohibition which the President is authorized to enact, or not to enact, as he pleases. And if that legislative power may be given to the President or other grantee, it would seem to follow that such power may similarly be conferred with respect to the transportation of other commodities in interstate·commerce with or without reference to state action, thus giving to the grantee of the power the determination of what is a wise policy as to that transportation, and authority to permit or prohibit it, as the person, or board or commission, so chosen, may

think desirable. In that view, there would appear to be no ground for denying a similar prerogative of delegation with respect to other subjects of legislation.

The Constitution provides that "All legislative powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." Art. I, § 1. And the Congress is empowered " To make all laws which shall be necessary and proper for carrying into execution " its general powers. Art. I, § 8, par. 18. The Congress manifestly is not permitted to abdicate, or to transfer to others, the essential legislative functions with which it is thus vested. Undoubtedly legislation must often be adapted to complex conditions involving a host of details with which the national legislature cannot deal directly. The Constitution has never been regarded as denying to the Congress the necessary resources of flexibility and practicality, which will enable it to perform its function in laying down policies and establishing standards, while leaving to selected instrumentalities the making of subordinate rules within prescribed limits and the determination of facts to which the policy as declared by the legislature is to apply. Without capacity to give authorizations of that sort we should have the anomaly of a legislative power which in many circumstances calling for its exertion would be but a futility. But the constant recognition of the necessity and validity of such provisions, and the wide range of administrative authority which has been developed by means of them, cannot be allowed to obscure the limitations of the authority to delegate, if our constitutional system is to be maintained.

The Court has had frequent occasion to refer to these limitations and to review the course of congressional action. At the very outset, amid the disturbances due to war in Europe, when the national safety was imperiled

and our neutrality was disregarded, the Congress passed a series of acts, as a part of which the President was authorized, in stated circumstances, to lay and revoke embargoes, to give permits for the exportation of arms and military stores, to remit and discontinue the restraints and prohibitions imposed by acts suspending commercial intercourse with certain countries, and to permit or interdict the entrance into waters of the United States of armed vessels belonging to foreign nations.[7] These early acts were not the subject of judicial decision and, apart from that, they afford no adequate basis for a conclusion that the Congress assumed that it possessed an unqualified power of delegation. They were inspired by the vexations of American commerce through the hostile enterprises of the belligerent powers,[8] they were directed to the effective execution of policies repeatedly declared by the Congress, and they confided to the President, for the purposes and under the conditions stated, an authority which was cognate to the conduct by him of the foreign relations of the Government.[9]

---

[7] Acts of June 4, 1794, 1 Stat. 372; March 3, 1795, 1 Stat. 444; June 13, 1798, 1 Stat. 565, 566; February 9, 1799, 1 Stat. 613, 615; February 27, 1800, 2 Stat. 7, 9, 10; March 3, 1805, 2 Stat. 339, 341, 342; February 28, 1806, 2 Stat. 351, 352; April 22, 1808, 2 Stat. 490.

[8] Marshall's Life of Washington, Vol. 2, pp. 319, *et seq.*

[9] Thus, prior to the Act of June 4, 1794 (1 Stat. 372), the Congress had laid embargoes, for limited periods, upon vessels in ports of the United States bound to foreign ports. Resolutions of March 26, 1794, and April 18, 1794, 1 Stat. 400, 401. Fearing that the national safety might be endangered, the President, by the Act of June 4, 1794, was authorized to lay an embargo, with appropriate regulations, whenever he found " that the public safety shall so require," the authority not to be exercised while the Congress was in session and the embargo to be limited in any case to 15 days after the commencement of the next session. The Act of March 3, 1795 (1 Stat. 444), authorizing the President to permit the exportation of arms, etc. was " in cases connected with the security of the commercial interest of the

The first case relating to an authorization of this description was that of *The Brig Aurora,* 7 Cranch 382. The cargo of that vessel had been condemned as having been imported from Great Britain in violation of the non-intercourse Act of March 1, 1809. 2 Stat. 528. That Act expired on May 1, 1810,[10] when Congress passed another

United States and for public purposes only." By the Act of June 13, 1798 (1 Stat. 565), commercial intercourse was suspended between the United States and France and its dependencies. The Act was to continue only until the end of the next session of Congress and it was provided (§ 5) that if, before the next session, the Government of France " shall clearly disavow, and shall be found to refrain from the aggressions, depredations and hostilities " against the vessels and other property of citizens of the United States, and shall acknowledge the neutrality of the United States, " it shall be lawful for the President," " being well ascertained of the premises," to remit and discontinue the prohibitions and restraints imposed by the Act and to make proclamation accordingly. The Act of February 9, 1799 (1 Stat. 613), further suspended commercial intercourse between the United States and France and its dependencies until March 3, 1800, and gave a similar authority (§ 4) to the President to remit and discontinue the restraints and prohibitions of the Act, " if he shall deem it expedient and consistent with the interest of the United States," either with respect to the French Republic or to any place belonging to that Republic, " with which a commercial intercourse may safely be renewed," and to revoke such order if he found that the interest of the United States so required. The suspension of commercial intercourse was renewed by the Act of February 27, 1800 (2 Stat. 7) until March 3, 1801, with a similar provision as to the authority of the President. The Act of March 3, 1805 (2 Stat. 339) related to persons committing treason, felony, etc. within the jurisdiction of the United States and taking refuge in foreign armed vessels, and the authority to the President to permit or prevent the entry of such vessels into the waters of the United States (§ 4) was " in order to prevent insults to the authority of the laws, whereby the peace of the United States with foreign nations may be endangered." See also Act of April 22, 1808, 2 Stat. 490. See also, Proclamations of President Adams, " Works of John Adams," Vol. IX, pp. 176, 177.

[10] See Act of June 28, 1809, 2 Stat. 550.

Act (2 Stat. 605, 606) providing that in case either Great Britain or France, before March 3, 1811, " shall . . . so revoke or modify her edicts as that they shall cease to violate the neutral commerce of the United States, which fact the President of the United States shall declare by proclamation, and if the other nation shall not within three months thereafter so revoke or modify her edicts in like manner," then, with respect to that nation, as stated, the provisions of the Act of 1809, after three months from that proclamation, " shall . . . be revived and have full force and effect." On November 2, 1810, the President issued his proclamation declaring that France had so revoked or modified her edicts, and it was contended that the provisions of the Act of 1809, as to the cargo in question, had thus been revived. The Court said that it could see no sufficient reason why the legislature should not exercise its discretion in reviving the Act of 1809, " either expressly or conditionally, as their judgment should direct." The provision of that Act declaring " that it should continue in force to a certain time, and no longer," could not restrict the power of the legislature to extend its operation " without limitation upon the occurrence of any subsequent combination of events." This was a decision, said the Court in *Field* v. *Clark*, 143 U. S. 649, 683, " that it was competent for Congress to make the revival of an act depend upon the proclamation of the President, showing the ascertainment by him of the fact that the edicts of certain nations had been so revoked or modified that they did not violate the neutral commerce of the United States."

In *Field* v. *Clark, supra,* the Court applied that ruling to the case of " the suspension of an act upon a contingency to be ascertained by the President, and made known by his proclamation." The Court was dealing with § 3 of the Act of October 1, 1890, 26 Stat. 567, 612.

That section provided that, "with a view to secure reciprocal trade" with countries producing certain articles, "whenever, and so often as the President shall be satisfied" that the Government of any country producing them imposed "duties or other exactions upon the agricultural or other products of the United States" which, in view of the free list established by the Act, the President "may deem to be reciprocally unequal and unreasonable, he shall have the power and it shall be his duty," to suspend the free introduction of those articles by proclamation to that effect, and that during that suspension the duties specified by the section should be levied. The validity of the provision was challenged as a delegation to the President of legislative power. The Court reviewed the early acts to which we have referred, as well as later statutes considered to be analogous.[11] While sustaining the provision, the Court emphatically declared that the principle that "Congress cannot delegate legislative power to the President" is "universally

---

[11] Acts of March 3, 1815, 3 Stat. 224; March 3, 1817, 3 Stat. 361; January 7, 1824, 4 Stat. 2; May 24, 1828, 4 Stat. 308; May 31, 1830, 4 Stat. 425; March 6, 1866, 14 Stat. 3; March 3, 1883, 22 Stat. 490; June 26, 1884, 23 Stat. 57; October 1, 1890, 26 Stat. 616. R. S. 2493, 2494, 4219, 4228. Proclamations of Presidents; 3 Stat. App. I; 4 Stat. App. III, 814–818; 9 Stat. App. 1001, 1004; 11 Stat. App. 795; 13 Stat. App. 739; 14 Stat. App. 818, 819; 16 Stat. App. 1127; 17 Stat. App. 954, 956, 957; 21 Stat. 800; 23 Stat. 841, 842, 844.

For other analogous statutes, see Acts of December 17, 1813, 3 Stat. 88, 93; June 19, 1886, 24 Stat. 79, 82; March 3, 1887, 24 Stat. 475; August 30, 1890, 26 Stat. 414, 415; February 15, 1893, 27 Stat. 449, 452; March 2, 1895, 28 Stat. 727, 733; September 8, 1916, 39 Stat. 756, 799; June 15, 1917, 40 Stat. 217, 225; August 10, 1917, 40 Stat. 276; October 6, 1917, 40 Stat. 411, 422; March 4, 1919, 40 Stat. 1348, 1350; June 17, 1930, 46 Stat. 590, 704. Resolutions of March 14, 1912, 37 Stat. 630; January 31, 1922, 42 Stat. 361. Proclamations: 24 Stat. 1024, 1025, 1028, 1030; 27 Stat. 995, 1011; 38 Stat. 1960; 39 Stat. 1756; 40 Stat. 1683, 1689, *et seq.*

recognized as vital to the integrity and maintenance of the system of government ordained by the Constitution." The Court found that the act before it was not inconsistent with that principle; that it did not "in any real sense, invest the President with the power of legislation." As "the suspension was absolutely required when the President ascertained the existence of a particular fact," it could not be said "that in ascertaining that fact and in issuing his proclamation, in obedience to the legislative will, he exercised the function of making laws." "He was the mere agent of the law-making department to ascertain and declare the event upon which its expressed will was to take effect." *Id.*, pp. 692, 693. The Court referred with approval to the distinction pointed out by the Supreme Court of Ohio in *Cincinnati, W. & Z. R. Co.* v. *Commissioners*, 1 Ohio St. 88, between "the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring authority or discretion as to its execution, to be exercised under and in pursuance of the law."

Applying that principle, authorizations given by Congress to selected instrumentalities for the purpose of ascertaining the existence of facts to which legislation is directed, have constantly been sustained. Moreover, the Congress may not only give such authorizations to determine specific facts but may establish primary standards, devolving upon others the duty to carry out the declared legislative policy, that is, as Chief Justice Marshall expressed it, "to fill up the details" under the general provisions made by the legislature. *Wayman* v. *Southard*, 10 Wheat. 1, 43. In *Buttfield* v. *Stranahan*, 192 U. S. 470, 496, the Act of March 2, 1897 (29 Stat. 604, 605) was upheld, which authorized the Secretary of the Treasury, upon the recommendation of a board of experts, to "establish uniform standards of purity, quality, and fitness

for the consumption of all kinds of teas imported into the United States." The Court construed the statute as expressing " the purpose to exclude the lowest grades of tea, whether demonstrably of inferior purity, or unfit for consumption, or presumably so because of their inferior quality." The Congress, the Court said, thus fixed " a primary standard " and committed to the Secretary of the Treasury " the mere executive duty to effectuate the legislative policy declared in the statute." " Congress legislated on the subject as far as was reasonably practicable, and from the necessities of the case was compelled to leave to executive officials the duty of bringing about the result pointed out by the statute." See *Red " C " Oil Co.* v. *North Carolina,* 222 U. S. 380, 394.

Another notable illustration is that of the authority given to the Secretary of War to determine whether bridges and other structures constitute unreasonable obstructions to navigation and to remove such obstructions. Act of March 3, 1899, § 18, 30 Stat. 1153, 1154. By that statute the Congress declared " a general rule and imposed upon the Secretary of War the duty of ascertaining what particular cases came within the rule " as thus laid down. *Union Bridge Co.* v. *United States,* 204 U. S. 364, 386; *Monongahela Bridge Co.* v. *United States,* 216 U. S. 177, 193; *Philadelphia Co.* v. *Stimson,* 223 U. S. 605, 638. Upon this principle rests the authority of the Interstate Commerce Commission, in the execution of the declared policy of the Congress in enforcing reasonable rates, in preventing undue preferences and unjust discriminations, in requiring suitable facilities for transportation in interstate commerce, and in exercising other powers held to have been validly conferred. *St. Louis, I. M. & S. Ry. Co.* v. *Taylor,* 210 U. S. 281, 287; *Intermountain Rate Cases,* 234 U. S. 476, 486; *Avent* v. *United States,* 266 U. S. 127, 130; *N. Y. Central Securities Corp.*

v. *United States,* 287 U. S. 12, 24, 25. Upon a similar ground the authority given to the President, in appropriate relation to his functions as Commander-in-Chief, by the Trading with the Enemy Act, as amended by the Act of March 28, 1918 (40 Stat. 460), with respect to the disposition of enemy property, was sustained. " The determination," said the Court, " of the terms of sales of enemy properties in the light of facts and conditions from time to time arising in the progress of war was not the making of a law; it was the application of the general rule laid down by the Act." *United States* v. *Chemical Foundation,* 272 U. S. 1, 12.[12]

The provisions of the Radio Act of 1927 (44 Stat. 1162, 1163), providing for assignments of frequencies or wave lengths to various stations, afford another instance. In granting licenses, the Radio Commission is required to act " as public convenience, interest, or necessity requires." In construing this provision, the Court found that the statute itself declared the policy as to " equality of radio broadcasting service, both of transmission and of reception," and that it conferred authority to make allocations and assignments in order to secure, according to stated criteria, an equitable adjustment in the distribution of facilities.[18] The standard set up was not so indefinite " as to confer an unlimited power." *Radio Commission* v. *Nelson Brothers Co.,* 289 U. S. 266, 279, 285.

So, also, from the beginning of the Government, the Congress has conferred upon executive officers the power to make regulations,—" not for the government of their departments, but for administering the laws which did govern." *United States* v. *Grimaud,* 220 U. S. 506, 517. Such regulations become, indeed, binding rules of con-

[12] See, also, §§ 4 (b) and 5 (a) of the Trading with the Enemy Act, 40 Stat. 411. 414, 415.

[18] Act of March 28, 1928, amending § 9 of the Radio Act of 1927, 45 Stat. 373.

duct, but they are valid only as subordinate rules and when found to be within the framework of the policy which the legislature has sufficiently defined. In the case of *Grimaud, supra,* a regulation made by the Secretary of Agriculture requiring permits for grazing sheep on a forest reserve of lands belonging to the United States was involved. The Court referred to the various acts for the establishment and management of forest reservations and the authorization of rules which would " insure the objects of such reservation," that is, " to regulate their occupancy and use and to preserve the forests thereon from destruction." The Court observed that " it was impracticable for Congress to provide general regulations for these various and varying details of management," and that, in authorizing the Secretary of Agriculture to meet local conditions, Congress " was merely conferring administrative functions upon an agent, and not delegating to him legislative power." *Id.,* pp. 515, 516. The Court quoted with approval the statement of the principle in *Field* v. *Clark, supra,* that the Congress cannot delegate legislative power, and upheld the regulation in question as an administrative rule for the appropriate execution of the policy laid down in the statute. See *Wayman* v. *Southard, supra; Interstate Commerce Commission* v. *Goodrich Transit Co.,* 224 U. S. 194, 214, 215; *Selective Draft Law Cases,* 245 U. S. 366, 389; *McKinley* v. *United States,* 249 U. S. 397.

The applicable considerations were reviewed in *Hampton & Co.* v. *United States,* 276 U. S. 394, where the Court dealt with the so-called " flexible tariff provision " of the Act of September 21, 1922 (42 Stat. 858, 941, 942), and with the authority which it conferred upon the President. The Court applied the same principle that permitted the Congress to exercise its rate-making power in interstate commerce, and found that a similar provision was justified for the fixing of customs duties; that is, as the Court said, " If Congress shall lay down by

legislative act an intelligible principle to which the person or body authorized to fix such rates is directed to conform, such legislative action is not a forbidden delegation of legislative power. If it is thought wise to vary the customs duties according to changing conditions of production at home and abroad, it may authorize the Chief Executive to carry out this purpose, with the advisory assistance of a Tariff Commission appointed under Congressional authority." The Court sustained the provision upon the authority of *Field* v. *Clark, supra,* repeating with approval what was there said,—that " What the President was required to do was merely in execution of the act of Congress." *Id.,* pp. 409–411.

Thus, in every case in which the question has been raised, the Court has recognized that there are limits of delegation which there is no constitutional authority to transcend. We think that § 9 (c) goes beyond those limits. As to the transportation of oil production in excess of state permission, the Congress has declared no policy, has established no standard, has laid down no rule. There is no requirement, no definition of circumstances and conditions in which the transportation is to be allowed or prohibited.

If § 9 (c) were held valid, it would be idle to pretend that anything would be left of limitations upon the power of the Congress to delegate its law-making function. The reasoning of the many decisions we have reviewed would be made vacuous and their distinctions nugatory. Instead of performing its law-making function, the Congress could at will and as to such subjects as it chose transfer that function to the President or other officer or to an administrative body. The question is not of the intrinsic importance of the particular statute before us, but of the constitutional processes of legislation which are an essential part of our system of government.

*Sixth.* There is another objection to the validity of the prohibition laid down by the Executive Order under § 9 (c). The Executive Order contains no finding, no statement of the grounds of the President's action in enacting the prohibition. Both § 9 (c) and the Executive Order are in notable contrast with historic practice (as shown by many statutes and proclamations we have cited in the margin [14]) by which declarations of policy are made by the Congress and delegations are within the framework of that policy and have relation to facts and conditions to be found and stated by the President in the appropriate exercise of the delegated authority. If it could be said that from the four corners of the statute any possible inference could be drawn of particular circumstances or conditions which were to govern the exercise of the authority conferred, the President could not act validly without having regard to those circumstances and conditions. And findings by him as to the existence of the required basis of his action would be necessary to sustain that action, for otherwise the case would still be one of an unfettered discretion as the qualification of authority would be ineffectual. The point is pertinent in relation to the first section of the National Industrial Recovery Act. We have said that the first section is but a general introduction, that it declares no policy and defines no standard with respect to the transportation which is the subject of § 9 (c). But if from the extremely broad description contained in that section and the widely different matters to which the section refers, it were possible to derive a statement of prerequisites to the President's action under § 9 (c), it would still be necessary for the President to comply with those conditions and to show that compliance as the ground of his prohibition. To hold

---

[14] See Acts and Proclamations cited in Note 11, *supra.*

that he is free to select as he chooses from the many and various objects generally described in the first section, and then to act without making any finding with respect to any object that he does select, and the circumstances properly related to that object, would be in effect to make the conditions inoperative and to invest him with an uncontrolled legislative power.

We are not dealing with action which, appropriately belonging to the executive province, is not the subject of judicial review, or with the presumptions attaching to executive action.[15] To repeat, we are concerned with the question of the delegation of legislative power. If the citizen is to be punished for the crime of violating a legislative order of an executive officer, or of a board or commission, due process of law requires that it shall appear that the order is within the authority of the officer, board or commission, and, if that authority depends on determinations of fact, those determinations must be shown. As the Court said in *Wichita Railroad & Light Co.* v. *Public Utilities Comm'n,* 260 U. S. 48, 59: " In creating such an administrative agency the legislature, to prevent its being a pure delegation of legislative power, must enjoin upon it a certain course of procedure and certain rules of decision in the performance of its function. It is a wholesome and necessary principle that such an agency must pursue the procedure and rules enjoined and show a substantial compliance therewith to give validity to its action. When, therefore, such an administrative agency is required as a condition precedent to an order, to make a finding of facts, the validity of the order must rest upon the needed finding. If it is lacking, the order is ineffective.

[15] See *Philadelphia & Trenton R. Co.* v. *Stimpson,* 14 Pet. 448, 458; *Martin* v. *Mott,* 12 Wheat. 19, 30, 32; *Dakota Central Telephone Co.* v. *South Dakota,* 250 U. S. 163, 182, 184; *United States* v. *Chemical Foundation,* 272 U. S. 1, 14, 15; *Sterling* v. *Constantin,* 287 U. S. 378, 399.

It is pressed on us that the lack of an express finding may be supplied by implication and by reference to the averments of the petition invoking the action of the Commission. We can not agree to this." Referring to the ruling in the *Wichita* case, the Court said in *Mahler* v. *Eby*, 264 U. S. 32, 44: " We held that the order in that case made after a hearing and ordering a reduction was void for lack of the express finding in the order. We put this conclusion not only on the language of the statute but also on general principles of constitutional government." We cannot regard the President as immune from the application of these constitutional principles. When the President is invested with legislative authority as the delegate of Congress in carrying out a declared policy, he necessarily acts under the constitutional restriction applicable to such a delegation.

We see no escape from the conclusion that the Executive Orders of July 11, 1933, and July 14, 1933, and the Regulations issued by the Secretary of the Interior thereunder, are without constitutional authority.

The decrees of the Circuit Court of Appeals are reversed and the causes are remanded to the District Court with direction to modify its decrees in conformity with this opinion so as to grant permanent injunctions, restraining the defendants from enforcing those orders and regulations.

*Reversed.*

MR. JUSTICE CARDOZO, dissenting.

With all that is said in the opinion of the court as to the Code of Fair Competition adopted by the President August 16, 1933, for the governance of the petroleum industry, I am fully in accord. No question is before us at this time as to the power of Congress to regulate production. No question is here as to its competence to clothe the President with a delegated power whereby a Code of Fair Competition may become invested with the force of

law. The petitioners were never in jeopardy by force of such a code or of regulations made thereunder. They were not in jeopardy because there was neither statute nor regulation subjecting them to pains or penalties if they set the code at naught. One must deplore the administrative methods that brought about uncertainty for a time as to the terms of executive orders intended to be law. Even so, the petitioners do not stand in need of an injunction to restrain the enforcement of a non-existent mandate.

I am unable to assent to the conclusion that § 9 (c) of the National Recovery Act, a section delegating to the President a very different power from any that is involved in the regulation of production or in the promulgation of a code, is to be nullified upon the ground that his discretion is too broad or for any other reason. My point of difference with the majority of the court is narrow. I concede that to uphold the delegation there is need to discover in the terms of the act a standard reasonably clear whereby discretion must be governed. I deny that such a standard is lacking in respect of the prohibitions permitted by this section when the act with all its reasonable implications is considered as a whole. What the standard is becomes the pivotal inquiry.

As to the nature of the *act* which the President is authorized to perform there is no need for implication. That at least is definite beyond the possibility of challenge. He may prohibit the transportation in interstate and foreign commerce of petroleum and the products thereof produced or withdrawn from storage in excess of the amount permitted by any state law or valid regulation or order prescribed thereunder. He is not left to roam at will among all the possible subjects of interstate transportation, picking and choosing as he pleases. I am far from asserting now that delegation would be

valid if accompanied by all that latitude of choice. In the laying of his interdict he is to confine himself to a particular commodity, and to that commodity when produced or withdrawn from storage in contravention of the policy and statutes of the states. He has choice, though within limits, as to the occasion, but none whatever as to the means. The means have been prescribed by Congress. There has been no grant to the Executive of any roving commission to inquire into evils and then, upon discovering them, do anything he pleases. His act being thus defined, what else must he ascertain in order to regulate his discretion and bring the power into play? The answer is not given if we look to § 9 (c) only, but it comes to us by implication from a view of other sections where the standards are defined. The prevailing opinion concedes that a standard will be as effective if imported into § 9 (c) by reasonable implication as if put there in so many words. If we look to the whole structure of the statute, the test is plainly this, that the President is to forbid the transportation of the oil when he believes, in the light of the conditions of the industry as disclosed from time to time, that the prohibition will tend to effectuate the declared policies of the act,—not merely his own conception of its policies, undirected by any extrinsic guide, but the policies announced by § 1 in the forefront of the statute as an index to the meaning of everything that follows.[1]

---

[1] " Section 1. . . . It is hereby declared to be the policy of Congress to remove obstructions to the free flow of interstate and foreign commerce which tend to diminish the amount thereof; and to provide for the general welfare by promoting the organization of industry for the purpose of coöperative action among trade groups, to induce and maintain united action of labor and management under adequate governmental sanctions and supervision, to eliminate unfair competitive practices, to promote the fullest possible utilization of the present productive capacity of industries, to avoid undue restriction of produc-

436

Oil produced or transported in excess of a statutory quota is known in the industry as "hot oil," and the record is replete with evidence as to the effect of such production and transportation upon the economic situation and upon national recovery. A declared policy of Congress in the adoption of the act is "to eliminate unfair competitive practices." Beyond question an unfair competitive practice exists when "hot oil" is transported in interstate commerce with the result that law-abiding dealers must compete with lawbreakers. Here is one of the standards set up in the act to guide the President's discretion. Another declared policy of Congress is "to conserve natural resources." Beyond question the disregard of statutory quotas is wasting the oil fields in Texas and other states, and putting in jeopardy of exhaustion one of the treasures of the nation. All this is developed in the record and in the arguments of counsel for the government with a wealth of illustration. Here is a second standard. Another declared policy of Congress is to "promote the fullest possible utilization of the present productive capacity of industries," and "except as may be temporarily required" to "avoid undue restriction of production." Beyond question prevailing conditions in the oil industry have brought about the need for temporary restriction in order to promote in the long run the fullest productive capacity of business in all its many

tion (except as may be temporarily required), to increase the consumption of industrial and agricultural products by increasing purchasing power, to reduce and relieve unemployment, to improve standards of labor, and otherwise to rehabilitate industry and to conserve natural resources."

The Act as a whole is entitled as one "To encourage national industrial recovery, to foster fair competition, and to provide for the construction of certain useful public works, and for other purposes"; and the heading of Title I, which includes §§ 1 to 10, is "Industrial Recovery."

branches, for the effect of present practices is to diminish that capacity by demoralizing prices and thus increasing unemployment. The ascertainment of these facts at any time or place was a task too intricate and special to be performed by Congress itself through a general enactment in advance of the event. All that Congress could safely do was to declare the act to be done and the policies to be promoted, leaving to the delegate of its power the ascertainment of the shifting facts that would determine the relation between the doing of the act and the attainment of the stated ends. That is what it did. It said to the President in substance: You are to consider whether the transportation of oil in excess of the statutory quotas is offensive to one or more of the policies enumerated in § 1, whether the effect of such conduct is to promote unfair competition or to waste the natural resources or to demoralize prices or to increase unemployment or to reduce the purchasing power of the workers of the nation. If these standards or some of them have been flouted with the result of a substantial obstruction to industrial recovery, you may then by a prohibitory order eradicate the mischief.

I am not unmindful of the argument that the President has the privilege of choice between one standard and another, acting or failing to act according to an estimate of values that is individual and personal. To describe his conduct thus is to ignore the essence of his function. What he does is to inquire into the industrial facts as they exist from time to time. Cf. *Hampton & Co.* v. *United States,* 276 U. S. 394, at p. 409; *Locke's Appeal,* 72 Penn. St. 491, 498, quoted with approval in *Field* v. *Clark,* 143 U. S. 649, at p. 694. These being ascertained, he is not to prefer one standard to another in any subjective attitude of mind, in any personal or wilful way. He is to study the facts objectively, the violation of a standard

impelling him to action or inaction according to its observed effect upon industrial recovery,—the ultimate end, as appears by the very heading of the title, to which all the other ends are tributary and mediate. Nor is there any essential conflict among the standards *inter se*, at all events when they are viewed in relation to § 9 (c) and the power there conferred. In its immediacy, the exclusion of oil from the channels of transportation is a restriction of interstate commerce, not a removal of obstructions. This is self-evident, and, of course, was understood by Congress when the discretionary power of exclusion was given to its delegate. But what is restriction in its immediacy may in its ultimate and larger consequences be expansion and development. Congress was aware that for the recovery of national well-being there might be need of temporary restriction upon production in one industry or another. It said so in § 1. When it clothed the President with power to impose such a restriction—to prohibit the flow of oil illegally produced—it laid upon him a mandate to inquire and determine whether the conditions in that particular industry were such at any given time as to make restriction helpful to the declared objectives of the act and to the ultimate attainment of industrial recovery. If such a situation does not present an instance of lawful delegation in a typical and classic form (*Field* v. *Clark,* 143 U. S. 649; *United States* v. *Grimaud,* 220 U. S. 506; *Hampton & Co.* v. *United States,* 276 U. S. 394), categories long established will have to be formulated anew.

In what has been written, I have stated, but without developing the argument, that by reasonable implication the power conferred upon the President by § 9 (c) is to be read as if coupled with the words that he shall exercise the power whenever satisfied that by doing so he will effectuate the policy of the statute as theretofore declared. Two canons of interpretation, each familiar to our law,

leave no escape from that conclusion. One is that the meaning of a statute is to be looked for, not in any single section, but in all the parts together and in their relation to the end in view. *Cherokee Intermarriage Cases,* 203 U. S. 76, 89; *McKee* v. *United States,* 164 U. S. 287; *Talbott* v. *Silver Bow County,* 139 U. S. 438, 443, 444. The other is that when a statute is reasonably susceptible of two interpretations, by one of which it is unconstitutional and by the other valid, the court prefers the meaning that preserves to the meaning that destroys. *United States* v. *Delaware & Hudson Co.,* 213 U. S. 366, 407; *Knights Templars' Indemnity Co.* v. *Jarman,* 187 U. S. 197, 205. Plainly, § 1, with its declaration of the will of Congress, is the chart that has been furnished to the President to enable him to shape his course among the reefs and shallows of this act. If there could be doubt as to this when § 1 is viewed alone, the doubt would be dispelled by the re-iteration of the policy in the sections that come later. In § 2, which relates to administrative agencies, in § 3, which relates to Codes of Fair Competition, in § 4, which relates to agreements and licenses, in § 6, which prescribes limitations upon the application of the statute, and in § 10 which permits the adoption of rules and regulations, authority is conferred upon the President to do one or more acts as the delegate of Congress when he is satisfied that thereby he will aid " in effectuating the policy of this title " or in carrying out its provisions. True § 9, the one relating to petroleum, does not by express words of reference embody the same standard, yet nothing different can have been meant. What, indeed, is the alternative? Either the statute means that the President is to adhere to the declared policy of Congress, or it means that he is to exercise a merely arbitrary will. The one construction invigorates the act; the other saps its life. A choice between them is not hard.

I am persuaded that a reference, express or implied, to the policy of Congress as declared in § 1 is a sufficient definition of a standard to make the statute valid. Discretion is not unconfined and vagrant. It is canalized within banks that keep it from overflowing. *Field* v. *Clark,* 143 U. S. 649; *United States* v. *Grimaud,* 220 U. S. 506, and *Hampton & Co.* v. *United States,* 276 U. S. 394, state the applicable principle. Under these decisions the separation of powers between the Executive and Congress is not a doctrinaire concept to be made use of with pedantic rigor. There must be sensible approximation, there must be elasticity of adjustment, in response to the practical necessities of government, which cannot foresee today the developments of tomorrow in their nearly infinite variety. The Interstate Commerce Commission, probing the economic situation of the railroads of the country, consolidating them into systems, shaping in numberless ways their capacities and duties, and even making or unmaking the prosperity of great communities (*Texas & Pacific Ry. Co.* v. *United States,* 289 U. S. 627), is a conspicuous illustration. See, e. g., 41 Stat. 479-482, c. 91, §§ 405, 406, 407, 408; 42 Stat. 27, c. 20; 49 U. S. C. §§ 3, 4, 5. Cf. *Intermountain Rate Cases,* 234 U. S. 476; *N. Y. Central Securities Corp.* v. *United States,* 287 U. S. 12, 24, 25; Sharfman, The Interstate Commerce Commission, vol. 2, pp. 357, 365. There could surely be no question as to the validity of an act whereby carriers would be prohibited from transporting oil produced in contravention of a statute if in the judgment of the commission the practice was demoralizing the market and bringing disorder and insecurity into the national economy. What may be delegated to a commission may be delegated to the President. " Congress may feel itself unable conveniently to determine exactly when its exercise of the legislative power should become effective, because dependent on future conditions, and it may leave

the determination of such time to the discretion of the executive." *Hampton & Co.* v. *United States, supra,* at p. 407. Only recently (1932) the whole subject was discussed with much enlightenment in the Report by the Committee on Ministers' Powers to the Lord Chancellor of Great Britain. See especially, pp. 23, 51. In the complex life of today, the business of government could not go on without the delegation, in greater or less degree, of the power to adapt the rule to the swiftly moving facts.

A striking illustration of this need is found in the very industry affected by this section, the production of petroleum and its transportation between the states. At the passage of the National Recovery Act no one could be certain how many of the states would adopt valid quota laws, or how generally the laws would be observed when adopted, or to what extent illegal practices would affect honest competitors or the stability of prices or the conservation of natural resources or the return of industrial prosperity. Much would depend upon conditions as they shaped themselves thereafter. Violations of the state laws might turn out to be so infrequent that the honest competitor would suffer little, if any, damage. The demand for oil might be so reduced that there would be no serious risk of waste, depleting or imperilling the resources of the nation. Apart from these possibilities the business might become stabilized through voluntary coöperation or the adoption of a code or otherwise. Congress not unnaturally was unwilling to attach to the state laws a sanction so extreme as the cutting off of the privilege of interstate commerce unless the need for such action had unmistakably developed. What was left to the President was to ascertain the conditions prevailing in the industry, and prohibit or fail to prohibit according to the effect of those conditions upon the phases of the national policy relevant thereto.

From a host of precedents available, both legislative and judicial, I cite a few as illustrations. By an act approved June 4, 1794, during the administration of Washington (1 Stat. 372; *Field* v. *Clark,* 143 U. S. 649, 683) Congress authorized the President, when Congress was not in session, and for a prescribed period "whenever, in his opinion, the public safety shall so require, to lay an embargo on all ships and vessels in the ports of the United States, or upon the ships and vessels of the United States, or the ships and vessels of any foreign nation, under such regulations as the circumstances of the case may require, and to continue or revoke the same, whenever he shall think proper." By an act of 1799, February 9 (1 Stat. 613, 615) suspending commercial intercourse with France and its dependencies, "it shall be lawful for the President of the United States, if he shall deem it expedient and consistent with the interest of the United States, by his order to remit, and discontinue, for the time being, the restraints and prohibitions aforesaid, . . . and also to revoke such order, [i. e., reëstablish the restraints] whenever, in his opinion, the interest of the United States shall require." By an act of October 1, 1890 (26 Stat. 567, 612), sustained in *Field* v. *Clark, supra,* the President was authorized to suspend by proclamation the free introduction into this country of enumerated articles when satisfied that a country producing them imposes duties or other exactions upon the agricultural or other products of the United States which he may deem to be reciprocally unequal or unreasonable. By an act of September 21, 1922, (42 Stat. 858, 941, 945), sustained in *Hampton & Co.* v. *United States, supra,* the President was empowered to increase or decrease tariff duties so as to equalize the differences between the costs of production at home and abroad, and empowered, by the same means, to give redress for other acts of discrimination or unfairness "when he finds that the public interest will be

served thereby." Delegation was not confined to an inquiry into the necessity or occasion for the change. It included the magnitude of the change, the delegate thus defining the act to be performed. By an act of June 4, 1897 (30 Stat. 11, 35), amended in 1905 (33 Stat. 628), regulating the forest reservations of the nation, the purpose of the reservations was declared to be " to improve and protect the forest within the reservation," and to secure " favorable conditions of water flows, and to furnish a continuous supply of lumber for the use and necessities of citizens of the United States." Without further guide or standard, the Secretary of Agriculture was empowered to " make such rules and regulations and establish such service as will insure the objects of such reservations, namely, to regulate their occupancy and use and to preserve the forests thereon from destruction." The validity of these provisions was upheld in *United States* v. *Grimaud, supra,* as against the claim by one who violated the rules that there had been an unlawful delegation. Many other precedents are cited in the margin.[2] They teach one lesson and a clear one.

There is no fear that the nation will drift from its ancient moorings as the result of the narrow delegation of power permitted by this section. What can be done under cover of that permission is closely and clearly circumscribed both as to subject matter and occasion. The statute was framed in the shadow of a national disaster. A host of unforeseen contingencies would have to be faced from day to day, and faced with a fulness of under-

---

[2] 2 Stat. 411, December 19, 1806; 3 Stat. 224, March 3, 1815; 23 Stat. 31, 32, May 29, 1884; 25 Stat. 659, February 9, 1889; 38 Stat. 717, September 26, 1914; 41 Stat. 593, May 10, 1920; *Williams* v. *United States,* 138 U. S. 514; *Buttfield* v. *Stranahan,* 192 U. S. 470; *Intermountain Rate Cases,* 234 U. S. 476; *Mahler* v. *Eby,* 264 U. S. 32. Cf. Emergency Banking Act of March 9, 1933; 48 Stat. 1; Agricultural Adjustment Act of May 12, 1933; 48 Stat. 51, 53, § 43.

standing unattainable by any one except the man upon the scene. The President was chosen to meet the instant need.

A subsidiary question remains as to the form of the executive order, which is copied in the margin.[3] The question is a subsidiary one, for unless the statute is invalid, another order with fuller findings or recitals may correct the informalities of this one, if informalities there are. But the order to my thinking is valid as it stands. The President was not required either by the Constitution or by any statute to state the reasons that had induced him to exercise the granted power. It is enough that the grant of power had been made and that pursuant to that grant he had signified the will to act. The will to act being declared, the law presumes that the declaration was preceded by due inquiry and that it was rooted in sufficient grounds. Such, for a hundred years and more, has been the doctrine of this court. The act of February 28, 1795 (1 Stat. 424), authorized the President " whenever the United States shall be invaded, or be in imminent danger of invasion from any foreign nation or Indian tribe," to call forth such number of the militia of the states as he shall deem necessary and to issue his

---

[3] " Executive Order. Prohibition of Transportation in Interstate and Foreign Commerce of Petroleum and the Products Thereof Unlawfully Produced or Withdrawn from Storage. By virtue of the authority vested in me by the Act of Congress entitled 'AN ACT To encourage national industrial recovery, to foster fair competition, and to provide for the construction of certain useful public works, and for other purposes,' approved June 16, 1933, (Public No. 67, 73d Congress), the transportation in interstate and foreign commerce of petroleum and the products thereof produced or withdrawn from storage in excess of the amount permitted to be produced or withdrawn from storage by any State law or valid regulation or order prescribed thereunder, by any board, commission, officer, or other duly authorized agency of a State, is hereby prohibited. Franklin D. Roosevelt. The White House, July 11, 1933."

orders to the appropriate officers for that purpose. Cf. Constitution, Article I, clause 15. When war threatened in the summer of 1812, President Madison acting under the authority of that statute directed Major General Dearborn to requisition from New York, Massachusetts and Connecticut certain numbers of the states' militia. American State Papers, Military Affairs, vol. 1, pp. 322–5. No finding of " imminent danger of invasion " was made by the President in any express way, nor was such a finding made by the Secretary of War or any other official. The form of the requisitions to Massachusetts and Connecticut appears in the state papers of the government (American State Papers, *supra*); the form of those to New York was almost certainly the same. Replevin was brought by a New York militiaman who refused to obey the orders, and whose property had been taken in payment of a fine imposed by a court-martial. The defendant, a deputy marshal, defended on the ground that the orders were valid, and the plaintiff demurred because there was no allegation that the President had adjudged that there was imminent danger of an invasion. The case came to this court. *Martin* v. *Mott,* 12 Wheat. 19. In an opinion by Story, J., the court upheld the seizure. " The argument is, [he wrote] that the power confided to the President is a limited power, and can be exercised only in the cases pointed out in the statute, and therefore, it is necessary to aver the facts which bring the exercise within the purview of the statute. In short, the same principles are sought to be applied to the delegation and exercise of this power intrusted to the Executive of the nation for great political purposes, as might be applied to the humblest officer in the government, acting upon the most narrow and special authority. It is the opinion of the Court, that this objection cannot be maintained. When the President exercises an authority confided to him by law, the presumption is, that it is exercised in pursuance

of law. Every public officer is presumed to act in obedience to his duty, until the contrary is shown; and, *a fortiori*, this presumption ought to be favourably applied to the chief magistrate of the Union. It is not necessary to aver, that the act which he may rightfully do, was so done." A like presumption has been applied in other cases and in a great variety of circumstances. *Philadelphia & Trenton R. Co.* v. *Stimpson*, 14 Pet. 448, 458; *Rankin* v. *Hoyt*, 4 How. 327, 335; *Carpenter* v. *Rannels*, 19 Wall. 138, 146; *The Confiscation Cases*, 20 Wall. 92, 109; *Knox County* v. *Ninth National Bank*, 147 U. S. 91, 97; *United States* v. *Chemical Foundation*, 272 U. S. 1, 14, 15. This does not mean that the individual is helpless in the face of usurpation. A court will not revise the discretion of the Executive, sitting in judgment on his order as if it were the verdict of a jury. *Martin* v. *Mott*, *supra*. On the other hand, we have said that his order may not stand if it is an act of mere oppression, an arbitrary fiat that overleaps the bounds of judgment. *Sterling* v. *Constantin*, 287 U. S. 378, 399, 400, 401. The complainants and others in their position may show, if they can, that in no conceivable aspect was there anything in the conditions of the oil industry in July, 1933, to establish a connection between the prohibitory order and the declared policies of the Congress. This is merely to say that the standard must be such as to have at least a possible relation to the act to be performed under the delegated power. One can hardly suppose that a prohibitory order would survive a test in court if the Executive were to assert a relation between the transportation of petroleum and the maintenance of the gold standard or the preservation of peace in Europe or the Orient. On the other hand, there can be no challenge of such a mandate unless the possibility of a rational nexus is lacking alto-

gether. Here, in the case at hand, the relation between the order and the standard is manifest upon the face of the transaction from facts so notorious as to be within the range of our judicial notice. There is significance in the fact that it is not challenged even now.

The President, when acting in the exercise of a delegated power, is not a quasi-judicial officer, whose rulings are subject to review upon certiorari or appeal (*Chicago Junction Case,* 264 U. S. 258, 265; cf. *Givens* v. *Zerbst,* 255 U. S. 11, 20), or an administrative agency supervised in the same way. Officers and bodies such as those may be required by reviewing courts to express their decision in formal and explicit findings to the end that review may be intelligent. *Florida* v. *United States,* 282 U. S. 194, 215; *Beaumont, Sour Lake & Western Ry. Co.* v. *United States,* 282 U. S. 74, 86; *United States* v. *Baltimore & Ohio R. Co., post,* p. 454. Cf. *Public Service Commission of Wisconsin* v. *Wisconsin Telephone Co.,* 289 U. S. 67. Such is not the position or duty of the President. He is the Chief Executive of the nation, exercising a power committed to him by Congress, and subject, in respect of the formal qualities of his acts, to the restrictions, if any, accompanying the grant, but not to any others. One will not find such restrictions either in the statute itself or in the Constitution back of it. The Constitution of the United States is not a code of civil practice.

The prevailing opinion cites *Wichita Railroad & Light Co.* v. *Public Utilities Commission of Kansas,* 260 U. S. 48, and *Mahler* v. *Eby,* 264 U. S. 32, 44. One dealt with a delegation to a public utilities commission of the power to reduce existing rates if they were found to be unreasonable; the other a delegation to the Secretary of Labor of the power to deport aliens found after notice and a hearing to be undesirable residents. In each it was a

specific requirement of the statute that the basic fact conditioning action by the administrative agency be stated in a finding and stated there expressly. If legislative power is delegated subject to a condition, it is a requirement of constitutional government that the condition be fulfilled. In default of such fulfilment, there is in truth no delegation, and hence no official action, but only the vain show of it. The analogy is remote between power so conditioned and that in controversy here.

Discretionary action does not become subject to review because the discretion is legislative rather than executive. If the reasons for the prohibition now in controversy had been stated in the order, the jurisdiction of the courts would have been no greater and no less. Investigation resulting in an order directed against a particular person after notice and a hearing is not to be confused with investigation preliminary and incidental to the formulation of a rule. An embargo under the act of 1794 would have been more than a nullity though there had been a failure to recite that what was done was essential to the public safety or to enumerate the reasons leading to that conclusion. If findings are necessary as a preamble to general regulations, the requirement must be looked for elsewhere than in the Constitution of the nation.

There are other questions as to the validity of § 9 (c) in matters unrelated to the delegation of power to the President, and also questions as to the Regulations adopted in behalf of the President by the Secretary of the Interior. They are not considered in the prevailing opinion. However, they have been well reviewed and disposed of in the opinion of Sibley, J., writing for the court below. It is unnecessary at this time to dwell upon them further.

The decree in each case should be affirmed.