GLENHAM INDEPENDENT SCHOOL DISTRICT NO. 12,
Appellant v.
WALWORTH COUNTY BOARD OF EDUCATION,
Respondent
MINDT et al., Appellant v. WALWORTH COUNTY BOARD
OF EDUCATION, Respondent
SCHLOMER et al., Appellants v. PERMAN et al.,
Respondents
(98 N.W.2d 348)
(File No. 9773. Opinion filed October 8, 1959)

**Chas. E. Gorsuch,** Aberdeen, for Appellants.

**O. W. Robbins,** State's Atty., Selby, **Frederick J. Homeyer,** Selby, for Respondents.

SMITH, J.   The Glenham Independent School District No. 12 of Walworth County, South Dakota, embraces a congressional township and operates a grade and high school in the city of Glenham. Pursuant to section 20, Chapter 8 of Chapter 41, Session Laws of 1955, as amended by section 3, Chapter 62, Session Laws of 1957, electors in the northern portion of the district petitioned the County Board of Education of Walworth County for a change of boundaries of the district. The change of boundaries described in the petition involved the transfer to the adjoining Mobridge Independent School District of approximately the north thirty sections of the township, and the reduction of the territory of the Glenham district to the area of the city of Glenham, the C., M., St. P. and P. Railway right of way and approximately six sections of farm land. A resolution of the County Board granted the petition. From this action of the County Board separate appeals to the circuit court were prosecuted by the Glenham district and the above named Walter Mindt and John F. Fiedler, residents and taxpayers of the deleted territory of the Glenham district. At the same time the above named Walter Schlomer and Frank Vojta, taxpayers and residents of the reduced area

of that district, instituted an action in circuit court praying that the County Board be restrained and enjoined from proceeding with the described change of boundaries of the district. Pursuant to the stipulation of counsel these several proceedings were ordered consolidated. After trial be novo in the circuit court a judgment was entered affirming the action of the County Board of Education. From that judgment the Glenham district and the respective individuals, above named, have appealed to this court.

Section 26 of Chapter 8 of Chapter 41, Session Laws of 1955 provides for an appeal by "Any party feeling aggrieved" by any decision made by the county board under Chapter 8 of Chapter 41 of the Session Laws of 1955. Having in view the differences in phrasing of this special provision for appeals under Chapter 8 of the above mentioned Ch. 41 and of the general provision for appeals from school decisions contained in section 44 of Chapter 9 of said Ch. 41, and looking to the course of our decisions dealing with the phrase "persons aggrieved" in like appeal statutes, cf. Camp Crook Independent School District No. 1, Harding County v. Shevling, 65 S.D. 14 at page 24, 270 N.W. 518, at page 523, this court, of its own motion, has given some consideration to the intention of the legislature to grant a right of appeal to a school district from decisions of the county board dealing with the reorganization of districts. As all of the questions raised by the parties are before us in the appeal by the individuals above named we have determined to reserve the point for future decision in a cause wherein it has been briefed and argued by counsel.

In 1955 the legislature enacted a "Public School Law Revision Act" cited as Ch. 41, Laws of 1955. Chapter 8 of that act is entitled "School District Organization". It is this chapter, as amended by the Laws of 1957, which is involved in the issues we are to consider. The section numbers we employ have reference to that chapter.

The legislature, by sections 7 to 12, inclusive, required each County Board of Education, with the assistance of the State Superintendent of Public Instruction, to develop a

preliminary plan and, after public hearings, to adopt a "Master Plan" for the reorganization of school districts within the county. It defined the term "reorganization" by subsection 1 of section 1 to "mean and include the formation, consolidation, or subdivision of school districts or any alteration whatsoever of school district boundaries." Subsequent sections of Ch. 8 prescribe the procedure for effecting reorganizations.

Section 5, which includes several subsections, in its original form reads in part as follows:

"Requirements and limitations for reorganization. Except for the reorganization of unorganized territory and the reorganization caused by an incorporated town or city extending its boundaries, any reorganization of school districts by either the electors or the county board must meet the following requirements and limitations for reorganization:

"1. No reorganization of school districts shall take place until the county or counties in which the reorganization is to take place has prepared a master plan which has been approved by the State Board of Education."

By section 1, Ch. 60, Laws of 1957, the above quoted subsection 1 of section 5 was amended to read as follows:

"(1) Prior to the final adoption of a county master plan, as provided by law, school districts may reorganize; provided that each such proposed reorganization is approved by the county board of education and a majority of the qualified electors in each school district whose boundaries are affected by such proposed reorganization, as evidenced by a petition for reorganization. Such petition shall be filed with the county auditor who shall certify that signatures on the aforementioned petitions represent a majority of the electors in each school district affected."

As we have indicated, the petition of the electors, and the change of boundaries resolution of the County Board of Education are founded on section 20, as amended by section 3, Ch. 62, Laws of 1957. That section reads as follows:

"Change of district boundaries. The county board shall have the power at its discretion upon proper petition as hereinafter provided to change any boundary of any school district within its county without a vote of any electors providing the boundary change does not create any more or any less school districts than those already in existence and providing such change meets the requirements and limitations for reorganization.

"All applications for a change in school district boundaries must be made to the county board of education in the form of a petition signed by over fifty percent of the electors residing in the area to be transferred by such boundary change. Any boundary change made under this section of the law shall not leave any school district with less than the minimum requirements of a school district as provided in this chapter."

■ ■ The first contention of appellants is that the amended subsection (1) of section 5 is a limitation upon the operation of amended section 20. Although a master plan for the reorganization of the school districts of Walworth county had been adopted, as provided by section 11, before a petition for the above described change of boundaries conforming to amended section 20 had been filed and granted by the action of the County Board, it is the position of the appellants that the action of the County Board was ineffective and void because the petition upon which they acted was not signed and filed by a majority of the electors of "each school district whose boundaries are affected by the proposed reorganization" as required by the amended subsection (1) of section 5.

The contention is untenable. The intention revealed by the original subsection 1 of section 5 was that, except for

the mentioned reorganization in unorganized territory and those resulting from extending municipal boundaries, reorganization of the school districts of a county should be delayed until the electors and the county board of education could have the benefit of the results of painstaking surveys and studies reflected in an adopted master plan. It seems self-evident that the quoted amendment of subsection (1) of section 5 was adopted to relax this original rigid restriction, and make possible, prior to the adoption of a master plan, a reorganization which is desired by a majority of the qualified electors in each school district whose boundaries are affected by such proposed reorganization, and approved by the county board of education.

As we have indicated by section 1, Ch. 60, Laws of 1957, the legislature adopted the quoted amended subsection (1) of section 5, and by section 3, Ch. 62, Laws of 1957, it amended section 20. Hence, the conclusion is impelled that it intended both provisions to remain in force. To adopt the interpretation of subsection (1) of section 5 urged by appellants would bring these provisions into collision and in effect repeal amended section 20. Further it would render meaningless the words "Prior to the final adoption of a county master plan" contained in the amended subsection (1) of section 5. On the other hand, to read that subsection as controlling in all reorganizations prior to the adoption of a master plan, excepting such reorganizations as result from extending municipal boundaries, and those dealing with unorganized territory, and to read all of the remaining provisions for reorganization, including section 20, as controlling in reorganizations subsequently to the adoption of master plan, assigns meaning to all of the words employed by the legislature, and conforms to the principle that interpretation of a legislative act should bring all of its parts into harmony. Tulare Independent School Dist. No. 36 v. Crandon School Dist. No. 17, 47 S.D. 391, 199 N.W. 451.

In arriving at the foregoing conclusion, we have not overlooked the language of section 20 which serves as the predicate for appellants' contention that subsection (1) of section 5 is a limitation upon section 20. Their argument

is that section 20 authorizes a change of boundaries "providing such change meets the requirements and limitations for reorganization"; that subsection (1) of section 5 is a "requirement and limitation for reorganization"; therefore, compliance therewith is essential to a valid change of boundaries. We are not persuaded by this reasoning. Although subsection (1) of section 5 is a requirement of reorganization, by its express terms its application is limited to reorganizations "Prior to the final adoption of a county master plan." Section 11 provides for the adoption of a master plan by the county board after holding public hearings on its preliminary plan. Section 12 provides: "Within ten days after the adoption of the master plan by the county board, the county board shall submit at least two copies of its plan to the State Superintendent." Section 17 provides: "All or any part of the **final approved** master plan **legally in effect** may be submitted from time to time to a vote of the electors * * *." Emphasis supplied. In our opinion the words: "Prior to the final adoption of a county master plan" contained in subsection (1) of section 5, supra, have reference to the final adoption of its master plan by the county board.

█ It is next contended that the time when action can be taken under amended section 20 is limited by section 21 as amended by Chs. 60 and 62, Laws of 1957. That section reads in part as follows:

"School districts combined by county board of education. Any school district which is or becomes one of the types of school districts described herein **shall be combined** with another district or other districts by the county board of education. Such action shall meet the requirements and limitations for reorganization and the county board shall take into consideration the wishes of the electors of the district to be joined and of the district to which it is to be joined. **Provided,** however, **that such action by the county board of education can only be taken after the master plan has been submitted and approved, and after the same either has been**

**rejected by the electors at the election therein, as hereinbefore provided, or that said plan has not been submitted to the electors within one year from the date of its approval."**

"The types of school districts which shall be combined with other school districts·

"1. (Repealed)

"2. A school district with all the taxable property in such district assessed at a lower valuation than one hundred thousand dollars;

"3. (Repealed)

"4. A school district which fails· to elect a school board member or members as provided by law for two successive annual elections." Emphasis supplied.

The argument that the action of the County Board, taken under amended section 20, is fatally defective is founded on the proviso we have emphasized. We are told that confusion would result if we failed to hold that the limitation contained in the proviso applies to amended section 20 as well as to amended section 21. That by the proviso the legislature intended to prohibit action by the County Board under amended section 21 until the master plan became ineffective is manifest. We are utterly unable to discern a basis which would warrant us in holding that it intended to prohibit changes of boundaries under amended section 20 until a master plan had become ineffective. The sections grant separate powers dealing with differing subject matters. To hold limitations upon the exercise of the one power, made mandatory by amended section 21 applicable to the other, made discretionary by amended section 20, in our opinion, would be to legislate while purporting to interpret.

The next contention is that the County Board was without authority to make the assailed change of boundary without developing and adopting a new master plan proposing such a reorganization. The contention has a factual background which should be briefly set forth.

On April 21, 1958, the County Board adopted a master plan which proposed a reorganization of four named existing districts into a single district and recommended all other existing districts of the county "be continued and maintained as they presently exist, subject to any petitions which may be placed before the County Board of Education for boundary changes, and * * * pending the filing of petitions for reorganization of part or all of said districts as the electors of said districts may institute as provided by law." Glenham Independent School District was among those districts which the master plan recommended remain unchanged. Thereafter the electors in the northern part of the district filed their petition praying for a change of boundary, and on April 29, 1958, the County Board adopted a resolution making the challenged change.

The contention is without statutory foundation. As we have pointed out supra, because, by subsection (1) of section 5, the legislature has provided a special procedure to be followed in reorganizations "Prior to the final adoption of a county master plan", it has manifested an intention that other provisions for reorganization, including amended section 20, are not to be invoked until after the adoption of a master plan. However, we are unable to discover anything in the act which imports an intention to require that such a reorganization as is contemplated by amended section 20 must first be proposed by a master plan. Furthermore, the power of the board to prepare and adopt a "new master plan" was contained in section 14, which was repealed by Ch. 60, Laws of 1957. In this connection, we observe the changes made in this act by Ch. 60, Laws of 1957, render inapplicable the expressions quoted to us from Hofer v. Bridgewater Independent School District, 76 S.D. 483, 81 N.W.2d 300.

Finally, we consider the contention of appellants that the granting of the petition for a change of boundaries constituted an abuse of the legislative discretion delegated by section 20 quoted supra. In developing the controlling facts we deal separately with the school districts involved, and thereafter with the proceedings of the County Board of Education.

The Glenham district embraced an entire township of thirty-six sections of farm lands. Glenham, the only municipality within the district, is a very small trading center with a population of about two hundred. It is located about two miles from the south boundary of the district and about equally distant from the east and west boundaries. It is on the main coast line of the Chicago, Milwaukee, St. Paul & Pacific Railway, and on U.S. Highway No. 12, extending east and west. A system of gravel roads connecting with the U.S. Highway No. 12 serves the farms of the district. Thirty years ago it completed its brick and concrete, steam-heated school building of nine classrooms and a small gymnasium. That building is well equipped and maintained, in excellent condition and of considerable present value. For many years the district has operated a twelve-year school program. During the past decade there has been a gradual decrease in the enrollment of children at the school until, at the time this petition was filed, there were 57 children in the grades and 27 students in the high school, and a staff of six teachers was maintained. Included in the high school enrollment were eight tuition students from adjoining districts, and six or seven adults taking typing and bookkeeping. These adults enrolled to assure such an enrollment as would qualify the high school for state aid. With the decrease in the number of students, controversy has developed in the district over the continuance of the high school. The ordered reorganization will force such a discontinuance and reduce the grade school enrollment to 37. Although the high school has not offered all of the courses available in the larger high schools, it has maintained accreditment and its graduates have succeeded in college and in business.

The assessed valuation of the district amounted to a little less than $1,000,000 and it anticipated an increase of $250,000 owing to an electric utility installation in the northern portion of its area. As a result of the ordered change, it loses thirty sections of its area, $568,353 of present assessed valuation, and $250,000 of anticipated assessed valuation.

The district has a cash balance of $13,000 and is without indebtedness. Its disbursements during the previous year

aggregated $33,438.02 including payroll of teachers and a cost of about $6,000 for heating and maintaining the building. Outgo during period exceeded income by $1,900 and income included $3,498.30 in state aid. Comparatively the cost per pupil, especially in the high school, was very high. These costs necessitated a levy at the highest rates permitted by law, viz., 11 mills on agricultural lands and 40 mills on all other property. The discontinuance of the high school will operate to classify the district as a common school district, and to limit the levy on property other than agricultural lands to 20 mills. In these changed circumstances the estimated annual income of the district from all sources will be about $9,500.

The Mobridge Independent School District embraces the area of the congressional township immediately west of the township constituting the Glenham district. Included therein is the city of Mobridge with a population of 5,000. The district has an assessed valuation of more than $15,000,000, a cash balance of $112,194.65 and a bonded debt of $386,000. Within Mobridge it operates three grade schools and one high school. About 700 are enrolled in the grades and 235 in the high school. Its tax levies, and its per pupil costs are very much lower than those of the Glenham district. It is fair, we think, to describe the Mobridge schools as an average city system. Its buildings and equipment are very adequate and well staffed. Fourteen high school instructors offer a full curriculum as well as extra curricular activities. Mobridge also has a Lutheran academy. Two or three children from the area ordered deleted are enrolled in the Mobridge schools and four or five students attend the academy. Mobridge is eight miles west of Glenham along U.S. Highway No. 12. Many of the children from the deleted area will be required to follow over graveled roads down to U.S. No. 12 and thence along the north edge of Glenham to Mobridge.

In August 1957, while the County Board was still engaged in consideration of its preliminary master plan for the county, a petition was filed with the board of electors of the Glenham district seeking to have transferred to the Mobridge district all of the area north of the south line

of the C. M. St. P. and P. Railway except the area of the city of Glenham. The Board held public hearings and took the petition under advisement. However, without acting on that petition, on April 21, 1958, the Board adopted a master plan. That plan proposed no reorganization of either the Glenham or the Mobridge district. However, on a map of Walworth County, made a part of the master plan, "community areas", as determined by the County Board, were delineated the Mobridge district, the Glenham district, and parts of other districts were embraced in one community area.

Within a few days after the adoption of the master plan the petition for a change of boundaries, presently under consideration, was filed with the Board. This petition excluded the C. M. St. P. & P. Railway right of way. On April 29, 1958, the Board adopted a resolution granting that petition. We quote from the mentioned resolution as follows: "It is recommended that the residents of the Glenham Independent School District No. 12, as it exists now and after the adoption of the above Resolution should consider taking immediate action to file a petition calling for an election on a plan of reorganization which would consolidate said Glenham Independent School District, No. 12 and any other adjoining district consistent with the Walworth County School District Reorganization Master Plan."

Pursuant to instructions from the County Board the County Superintendent as Secretary of the County Board addressed a letter to the Glenham Board of Education reading in part as follows: "The action of the Board was with recommendation that the residents of the Glenham district as it will exist after the transfer is made on July 1, 1958, take action as soon as possible to petition for an election consolidating themselves with other territory, on any plan consistent with the County Master Plan. The Plan places the Glenham District and most of Kennedy in one district with the Mobridge District, and the recommendation of the Board contemplates that there should be consolidation with Kennedy or Mobridge." The foregoing sentence has reference to the fact that the plan places Mobridge, Glenham and Kennedy in one community area.

■ The power to order the transfer of territory from a school district, delegated by section 20 to the county board of education, and to the circuit courts, is quasi judicial in nature and requires the exercise of a sound legislative discretion. Snow v. South Shore Independent School District, 66 S.D. 379, 283 N.W. 530 and cases cited. In that case we held that this court is not at liberty to interfere with the exercise of such a power except in case of an abuse of such discretion.

■ We digress to state that appellants also contend that section 20 constitutes an unconstitutional delegation of legislative power because the law-making body failed to provide its delegates with standards to guide them in the exercise of their discretion. We do not, and because a ruling on the point is rendered unnecessary by the views we are about to express on the merits, we should not, respond to that contention. In re Forming and Organizing Common School District for Part of Territory Embraced in Independent School Dist. of Emery, 61 S.D. 79, 246 N.W. 245. Such standards as the legislature has set up to regulate the discretion of its delegates are implicit and emerge from reading section 20 in connection with the whole of Ch. 8 in which it appears. We proceed with a consideration of the contention we have stated supra, under the assumption that standards are sufficient to sustain the legislation in question if they arise by reasonable implication. Cf. Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446.

Chapter 8 deals with the organization and reorganization of school districts. To further its purposes the legislature set up a county board of education in each county of the state, and as we have stated supra charges each such board with the duty of surveying its local scene, and after study and consultation to create a Master Plan for the reorganization of its school districts. Such a plan does not operate to reorganize any district. To create new districts proposed by it, or such other new districts as electors by petition are authorized to propose, elections are necessary. Cf. section 17 as amended by section 4, Ch. 60, Laws of 1957, and section 18 as amended by section 1, Ch. 62, Laws of 1957.

In the preparation of such plan the county boards, by section 9, are directed to aim at "greater equalization of educational opportunities for the inhabitants of the county, more efficient and economical administration of the public schools, and a more equitable distribution of public school revenues." The factors to be considered by such boards in arriving at its conclusions are listed in that section.

The respondents assume that it may reasonably be implied that the matters set forth in section 9 to regulate the preparation of a master plan, are the standards intended to guide the exercise of the discretion vested in the board by section 20. They point to the benefits to accrue to the inhabitants of the deleted area, and to the fact that the transfer "does not create any more or less districts", as section 20 provides, and assert that it cannot be said that the board or the court abused its discretion. As applied to section 20, we read a different legislative intention from this Chapter.

The preparation of the master plan and the directions contained therein in section 9 represent an attempt to encourage the creation of new and more efficient school corporations throughout the state. Section 20, however, as we understand it, deals with a somewhat different matter. It was intended thereby to provide a procedure through which electors of an area of a district might contribute to their convenience, or improve their educational or tax position by the transfer of their property to an adjoining existing district. Cf. State ex rel. Coatsworth v. Olson, 30 S.D. 573 at page 585, 139 N.W. 336, at page 337. But, whereas, in the procedure for creating new districts, the legislature has seen fit to grant a controlling voice to a majority of the electors of the transferred areas (cf. sections 17 and 18 as amended, cited supra) it adopted a different policy in dealing with the transfer of territory under section 20; in such cases, it provided that the will of the majority of electors, as expressed in their petition, be controlled by the county board of education. It is of controlling significance, we think, that, in this single type of reorganization, the legislature intended all districts involved in such a transfer of territory to survive as operative educational units; it provided by section 20

that such a transfer should not create less school districts. From these facts it seems manifest to us that the County Board was clothed with a legislative discretion in the premises to prevent such a petitioning majority of the electors of an area from serving their private interests to the critical detriment of any of the involved districts.

That the ordered change cannot be said to be detrimental to the Mobridge district is self-evident. It will be benefited by a material increase in its adequate assessed valuation, and will hardly notice the small addition to its enrollment. Hence, we conclude that the solution of our problem turns upon the impact of the ordered change upon the educational interests of the Glenham district.

It is apparent from the undisputed facts we have recited that the imperative and recognized need of Glenham is a district of greater rather than lesser area. In response to the needs of its patrons the district provided and equipped the splendid building we have described. That facility should serve education for many years. Its location is strategic; it can be conveniently reached from the whole countryside by gravel roads which feed into U.S. No. 12, the main artery of commerce of that section of the state. It was constructed and equipped to accommodate a grade and high school operation. In the exercise of the power solely vested in it, the board of education has seen fit to continue that character of operation for the benefit of the area even though its enrollment has been considerably reduced, and so to do has involved valiant effort, the acceptance of state aid and some reduction in its cash balance.

That the County Board realized it was dealing a catastrophic blow to Glenham and its educational program by withdrawing from it a major portion of its assessed valuation and a considerable number of its pupils is indicated by the contents of its resolution and the letter written by the county superintendent at its direction, from both of which we have quoted supra. In effect it told the Glenham board we are taking from you a major portion of your patrons and assessed valuation, but we suggest that you either try to reassociate

yourself with those patrons and that territory by consolidation with Mobridge, or that you attempt to acquire other resources and children through consolidation with Kennedy. Whether a consolidation can be effected is problematical. In the meantime the Glenham district is rendered comparatively impotent. It is left with limited resources, a small group of children and a building ill-adapted to its changed circumstances. To carry on it must assemble those children in two or three rooms warmed by separate heating units, and close the remainder of its building and its heating plant. While that building and its equipment deteriorates through lack of maintenance and use, many of the children for whom it was intended, including some from its immediate neighborhood, will be passing by in a school bus traveling to and from distant Mobridge.

The procedure for a change of boundaries was not provided to be employed as a tool to force a consolidation contrary to the will of a majority of the electors of a district, nor to withdraw property from a district which is essential to its efficient operation. In Snow v. South Shore Independent School District, 66 S.D. 379 at page 383, 283 N.W. 530 at page 532, we held "the fact that property is needed as a source of revenue may offer a sufficient reason, standing alone, to justify its retention within a district."

In view of the described circumstances, we are persuaded that the order and judgment, severing the Glenham district from the major portion of its territory and patrons, are unreasonable and arbitrary and constitute a manifest abuse of legislative discretion. Therefore, the judgment below is reversed with instructions to enter judgment for the above named individual appellants.

RENTTO and BIEGELMEIER, JJ., concur.

HANSON, P. J., and ROBERTS J., concurring specially.

HANSON, Presiding Judge (concurring specially).

I concur in the result but being unable to construe Section 20 of the School Law as a complete and independent method of school district reorganization it appears necessary to file this special concurrence.

On April 21, 1958, the County Board of Education of Walworth County approved a Master Plan for the reorganization of school districts in that county. The Master Plan was never finally approved by the electors of any school district involved in this proceeding.

On April 29, 1958, the Walworth County Board of Education granted the petition of certain electors residing in the Glenham Independent School District to delete a substantial portion of the Glenham district and attach it to the Mobridge Independent School District. Petitions were not filed by a majority of the electors in each of the school districts affected by the proposed reorganization as required by Subsection 1 of Section 5.

In my opinion the question has been considered and settled in the recent case of Hofer v. Bridgewater Independent School District, 76 S.D. 483, 81 N.W.2d. 300, 301. Section 20 of the School Law was quoted in full in that opinion. Apparently to emphasize its importance the following portion of the statute was italicized "providing such change meets the requirements and limitations for reorganization." In construing this statute the Court said "The power delegated to the County Board of Education to change boundaries of school districts upon the petition of a majority of electors residing in the territory sought to be transferred may be exercised only under the circumstances prescribed. The exercise of the power is subject to the restriction that boundary changes meet 'the requirements and limitations for reorganization' ". In other words it was determined that Section 20 was subject to all the requirements and limitations for the reorganization of school districts contained in Chapter 8 of Chapter 41 of the 1955 Session Laws and, in particular, Subsection 1 of Section 5 thereof, which then provided:

"Section 5. Requirements and limitations for reorganization. Except for the reorganization of unorganized territory and the reorganization caused by an incorporated town or city extending its boundaries, any reorganization of school districts by either the electors or the county board must meet the following requirements and limitations for reorganization:

"1. No reorganization of school districts shall take place until the county or counties in which the reorganization is to take place has prepared a master plan which has been approved by the State Board of Education;".

Subsection 1 of Section 5 has been amended by Chapter 60 of the Laws of 1957 to read as follows:

"(1) Prior to the **final adoption** of a county master plan, as provided by law, school districts may reorganize; provided that each such proposed reorganization is approved by the county board of education and a majority of the qualified electors in each school district whose boundaries are affected by such proposed reorganization, as evidence by a petition for reorganization. Such petition shall be filed with the county auditor who shall certify that signatures on the aforementioned petition represent a majority of the electors in each school district affected;".

Although Subsection 1 of Section 5 has been amended since the Hofer case, it still remains a positive restrictive limitation on any school district reorganization. Section 20, on the ohter hand, was not materially changed by amendment in 1957. It still retains the same restrictive clause construed in the Hofer case, i. e., any change of boundaries thereunder must meet "the requirements and limitations for reorganization." In my opinion this proviso has the same meaning today as we said it had in the Hofer case. In other words any boundary change under Section 20 must **meet all of the requirements and limitations for school reorganization** provided by law in Chapter 8 of Chapter 41 of the Session Laws of 1955, as amended, and in particular Subsection 1 of Section 5, as amended in 1957. The legislature expressly defined the term "requirements and limitations for reorganization" to mean that in Subsection 6 of Section 1. To hold otherwise, in effect, completely disregards and renders this restrictive proviso meaningless.

The words "approval" and "adoption" are used interchangeably throughout Chapter 8 in reference to the Master

Plan. However, the qualifying language "Prior to the **final adoption** of a county master plan, as provided by law" now appearing in Subsection 1 of Section 5 refers, in my opinion, to the final adoption of the master plan by the electors of the affected districts as provided in Sections 17 and 18 of the School Law. It manifestly does not refer to the mere approval of the master plan by the county boards of education. As the Master Plan in Walworth County has not been finally adopted by the electors under Sections 17 and 18 and as petitions were not filed by a majority of the electors in each school district affected by the proposed reorganization under Subsection 1 of Section 5, the attempted deletion of territory from the Glenham district under Section 20 is without force or effect.

To interpret Section 20 as a complete and independent method of school reorganization does violence, in my opinion, to the whole intent and purpose of the school reorganization procedure. It places power in the hands of a few petitioners to accomplish school district reorganization without regard to a Master Plan and without regard to the wishes of a majority of the electors in any district. Furthermore, the school district into which territory is thus transferred has no opportunity either to approve or disapprove of the proposed change.

ROBERTS, J., concurs.