BOTTLING CORPORATION OF SAMOA, Plaintiff

v.

H. REX LEE, Governor of American Samoa, Defendant

No. 190-1964

High Court of American Samoa

Civil Jurisdiction, Trial Division

November 10, 1964

George A. Wray, Counsel for the Plaintiff.

Alfred J. Gergely, Attorney General, Counsel for the Defendant.

OPINION OF THE COURT

MORROW, *Chief Justice.*

Plaintiff Bottling Corporation filed its complaint demanding that "(1) This Court issue a declaratory judgment that the Defendant, Governor H. Rex Lee, has an obligation under law to approve Plaintiff's application for tax exemption and/or that (2) This Court issue a judgment and order in the nature of a Writ of Mandamus requiring the Governor to grant approval of plaintiff's application for tax exemption as the law requires so that a certificate may issue for the tax exemption as provided for by the Industrial Incentive Act, Chapter 26.01, Code of American Samoa, 1961 edition, Public Laws 7–37."

■ On or about May 10, 1962 the Bottling Corporation applied for the tax exemption as set forth for new businesses under the Industrial Incentive Act. The principal parts of the Act pertinent in this case read as follows:

"Sec. 26.0101—PURPOSE: In order to establish a firm foundation for self-government and to assist the people of American Samoa to attain the maximum possible self-support, it is hereby declared to be the policy of the Government of American Samoa to attract new capital to American Samoa; to encourage the establishment of new businesses, to the extent that suitable facilities are available; and to promote and develop in American Samoa an economy suited to the needs and resources of the territory and its people. To achieve these objectives, exemption from the payment of taxes, customs duties, and business license fees imposed or levied by the Government of American Samoa may be allowed to new businesses in American Samoa. The Government of American Sa-

501

moa will regard each such certificate of exemption as being in the nature of a contract between the Government and the person or corporation to which the certificate is granted, and it will take no action to impair any rights granted by such certificate except as hereinafter provided."

"Sec. 26.0102—TAXES EXEMPT: 1. From and after the date of approval hereof, all persons or corporations duly qualified to do business in American Samoa and constituting new businesses within the meaning of this title may, upon application therefor and the granting of a certificate on the basis thereof, as hereinafter provided, be granted a ten-year graduated exemption as set forth below from the payment of taxes, customs duties, and business license fees imposed or levied by the Government of American Samoa:

"The first through the fifth year—100% exemption

The sixth through the seventh year—75% exemption

The eighth through the ninth year—50% exemption

The tenth year—25% exemption

"2. The rate of taxes, customs duties, and business license fees which are in effect on the date a person or corporation applies for a certificate of exemption shall, if the certificate is granted, be the rates which apply to such person or corporation during the period in which such person or corporation is entitled to the percentage of exemption described in subsection 1, of this section.

"3. Notwithstanding subsection 2, hereof, if the rate of any tax, customs duty, or business license fee is, at any time during the period in which a person or corporation is entitled to such percentage of exemption, lower than it was at the time such person or corporation applied for a certificate of exemption, such person or corporation shall, during such time, pay the prescribed percentage of such lower rate.

"4. The exemption described in such subsection 1 hereof shall relate to the particular new business conducted by the person or corporation to which the exemption is granted, and no new additional exemption shall be granted with respect to such particular business by reason of the subsequent operation of such business by a different person or corporation.

"3. No exemption from the payment of taxes, customs duties, or business license fees shall apply to or be granted to any officer, director, or employee of such new business, so long as he is em-

ployed by such new business, nor shall anyone doing business with a person or corporation which holds a certificate of exemption be regarded as qualifying for an exemption by reason of its doing business with such exempt person or corporation."

"Sec. 26.0103—TAX EXEMPTION BOARD: The provisions of this title shall be administered by a Tax Exemption Board of five members. The said Board shall include the Attorney General of American Samoa, who shall be the Chairman, the Treasurer of American Samoa, and three residents of American Samoa who shall be appointed by the Governor and who shall serve at his pleasure. All applications for exemption shall be filed with the said Board. In the performance of its duties hereunder, the said Board shall exercise the following powers:

"1. Conduct hearings, after due notice to all interested parties, with respect to applications for exemption. At the conclusion of such hearing, the Board shall determine whether the applicant for exemption is a new business within the meaning of this title. No later than 60 days from the receipt of the application, the Board shall submit the above determination to the Governor. The Governor shall, within 30 days, determine whether the business is a new business as defined herein and he shall approve or disapprove the application on the basis of such determination: Provided, That the Governor may also determine whether such new business is in the public interest and, even though a business is determined to be a new business, a certificate of exemption may be denied if it is determined by the Governor that such new business is not in the public interest. In the event the Governor approves an application, there shall be issued by the Attorney General within five days following such approval a certificate providing for such exemption. In the event the Governor does not act within 30 days, the determination of the Board will be final and if such determination is favorable to the applicant, the Attorney General shall issue a certificate as provided above."

The Governor referred the application for tax exemption to the Tax Exemption Board. On October 2, 1962 the Board reported (Exhibit C of Plaintiff's Complaint) to the Governor as follows:

"A meeting of the Tax Exemption Board has determined that the Bottling Company of Samoa is a new business under the provisions

503

of the industrial incentive law. The recommendation of the Tax Exemption Board however is that the Bottling Company should not be given the Tax Exemption as prescribed by the industrial incentive law. The reasons for this decision is that there will only be approximately ten new jobs open to the Samoan population. Although there will be a capital investment of around $75,000.00, it is not felt that the payment of the taxes would be a bar to this Corporation doing business in Samoa."

By letter (Exhibit B of Plaintiff's Complaint) dated October 16, 1962, Mr. Carpenter, the Bottling Corporation's President, wrote the Governor as follows:

"In regards to our meeting of October 12th, we are pleased to submit the following information:

"Capital Expenses for the first year of business if conducted properly would be as follows:

| | | |
|---|---|---|
| "Building | 15,000.00 | |
| Plant | 30,000.00 | |
| Delivery Vehicles | 8,000.00 | |
| Bottles and Cases | 37,000.00 | (59,000) |
| Office Equipment | 1,500.00 | |
| $CO_2$ Cylinder | 2,100.00 | |
| Vending Machines and Coolers | 4,000.00 | |
| Beginning Inventory | 7,000.00 | |
| Incidental Expenses | 5,000.00 | |
| Corporation Liabilities incurred as of 30/15/1968 [sic] | 3,400.00 | |

"The Bottling Corporation of Samoa is incorporated for $60,000.00 which will be paid once we file our incorporation papers with the Treasurer of the Government of American Samoa. We are negotiating with the Bank of Hawaii and The First National Bank, also located in Honolulu, for a $40,000.00 loan. You can readily see from the $100,000.00 we will have to work with, that it will be necessary to cut down on many of the items listed above and that the most efficient operation must be conducted in order to survive the first several years of business. The import duty on our raw materials, supplies, and equipment are as follows:

| | |
|---|---|
| "Sugar | 15% |
| $CO_2$ | 15% |

| | |
|---|---|
| Chemicals | 20% |
| Concentrate | 15% |
| Bottles | 20% |
| Cases | 15% |
| Six Pack Containers | 20% |
| Bottling Equipment | 25% |
| Vehicles | 25% |
| Parts | 25% |
| Building | 15% |

"We anticipate sales to Western Samoa of 30,000 cases a year at 1.20 per case F.O.B. Pago Pago Dock. This means an additional $36,000.00 new dollars being brought into American Samoa that will be used for wages, imports of raw materials, power, water, gas, oil, grease, paint, office supplies, and general expansion of the operation. At the best, the sales to Western Samoa will be marginal for several years until the efficiency of the Bottling operation has reached its zenith, as we must sell to them at a price considerably less than the price that it will be wholesaled for in American Samoa. They have a 36% import duty on this type of product, and naturally we could not compete with their present sources of supplies at a higher wholesale price.

"We intend to have a retail price of 10¢ per 10-oz. bottle for Coca-Cola and all flavors in American Samoa. The wholesale price to stores in American Samoa would be $1.60 per case delivered to their premises. We will also pick up empty bottles at no charge. A deposit of $1.00 per wooden case and 5¢ a bottle will be charged to the stores and they in turn will charge the customer the same deposit rate. This will do much to the cleaning up of the continual amount of empty cans you now see along the roads and sidewalks of Tutuila.

*"Industrial Incentive Act 26.01:*

"Before we made any commitments as to the forming of our Corporation, I discussed this Act with the best Corporate Attorney I could find in Honolulu. It was made quite clear to our group that there would be absolutely no doubt that our type of business would more than comply with the meaning of 'new business' as defined in the Industrial Incentive Act, lines 238–244. We proceeded to organize the corporation, negotiate with the Coca-Cola Corporation for a franchise, negotiate for building and equipment with this assumption in mind. In June of this year, we appeared before four mem-

bers of the five-member Tax Exemption Board and a final negative decision was received in the early part of this month. This, naturally, was quite a shock to us as the Bill is quite clear in stating what powers the Board shall exercise, lines 81–99 of the Industrial Incentive Act. I would like to quote lines 82–83 and 84 as follows:

" 'At the conclusion of such hearing, the Board shall determine whether the applicant for exemption is a new business within the meaning of this title.'

"I would also like to quote the meaning of a 'new business,' lines 238–241:

" 'new business' shall mean (1) a business involving the manufacture, processing, creating, or production of any articles or commodities not being manufactured, processed, created, or produced in American Samoa on or before January 1, 1960."

"In yesterday's mail, we were finally appointed with the Coca-Cola franchise for Samoa. This was wonderful news as we have been waiting several months for this decision. If land is made available and a favorable decision obtained on the industrial tax exemption, we will be ready to start business immediately."

By letter (Exhibit D of Plaintiff's Complaint) dated October 23, 1962, the Governor wrote Mr. Carpenter as follows:

"I have reviewed your letter of October 16, 1962, and the Tax Exemption Board's recommendation that no tax exemption be made to the bottling works. I have discussed the matter with certain members of the tax board and while I am reluctant to override the recommendation of that board, I am willing to partly do so in order to get this new business into American Samoa and to get it started.

"I am willing to grant tax exemption only on the initial capital investment in the plant and equipment. This would include tax on the building, plant, delivery vehicles, bottles and cases, office equipment, $CO_2$. cylinder, and vending machines and coolers. This exemption would apply on capital improvement items up to the first day of operation and would not apply on anything brought in thereafter. This tax would not include beginning inventory and raw materials which you would import.

506

"I have talked with our land people again about the site for your operation and told them to make a first order priority for possible sites near the airport so that you and other interested businesses might establish there. You might keep in touch with Mr. Aspinall on this matter in my absence."

By letter (Exhibit G of Plaintiff's Complaint) dated November 16, 1962, the Governor wrote Mr. Carpenter as follows:

"This will reply to your letter of November 13, 1962. I am sorry that you were disappointed with the limited tax exemption granted you in my letter of October 23.

"After carefully considering the negative recommendation of the Tax Exemption Board on this project and also all of the known elements involved, I feel that this exemption is the very best that can be done.

"In relation to your site problem we have run into some legal difficulties and also some problems in dealing with the owners of the land we have lately considered. Until these are cleared in court there is nothing I can do. Since my return I have had everyone involved in this matter together in my office for a meeting and have asked for speedy action. While I cannot predict the reaction of the owners or the court, I am hopeful that land will be soon available. You will be advised the minute there are any developments in this regard."

Plaintiff claims that it is entitled to a full tax exemption as set out in Sec. 26.0102(1) of the Industrial Incentive Act above quoted and not just an exemption "on the initial capital investment in the plant and equipment" as indicated in the Governor's letter of October 23, 1962 to Mr. Carpenter.

Complaint is made by the plaintiff that the Tax Exemption Board exceeded its statutory authority by recommending to the Governor "that the Bottling Company should not be given Tax Exemption as prescribed by the industrial incentive law." Plaintiff claims that the duty of the Board was limited to a finding that the business of the

plaintiff was a new business within the meaning of that term as defined in the Industrial Incentive Act. And that was true. However, the fact that the Board made a gratuitous recommendation to the Governor is not material as far as the decision in this case is concerned. Making such a recommendation was not illegal. It was just not called for by the statute.

■ It is next claimed by the plaintiff that the Governor could not legally grant a partial exemption. There are no guidelines or standards set out in the statute for granting partial exemptions. If we were to construe the statute as giving authority to the Governor to grant partial exemptions without prescribing any guidelines or standards by which he is to determine whether or not to grant such exemptions, we would be required to hold that the Industrial Incentive Act is unconstitutional. *Panama Refining Company v. Ryan*, 293 U.S. 388, 421–430; 79 L.Ed. 446, 464 (1934). It is our duty to interpret the Act so as to hold it constitutional, if possible.

"The Courts favor the constitutionality of statutes, and the cardinal principle of statutory construction is to save and not to destroy; the courts must sustain, or uphold, statutes, if possible, and are, or should be, reluctant to strike down a statute as unconstitutional." 16 C.J.S. 357–359.

■ The statute may be held constitutional by holding that it does not give the authority to the Governor to grant partial exemptions. If the Legislature had intended to give authority to the Governor to grant partial exemptions, we think they would have said so. We think that the granting of a partial exemption was a nullity because it was not authorized by the statute.

■ The Attorney General claims that the disjunctive "or" in the clause "No exemption from the payment of taxes, customs duties, or business license fees" in Sec. 26.0102(5) of the Act indicates that the Legislature in-

508

tended that partial exemptions could be granted. However, we note that the conjunctive "and" is used in the similar clauses contained in Sec. 26.0102(1) and Sec. 26.0102(2). We think that the Legislature did not intend to give the Governor authority to grant partial exemptions by the use of the disjunctive "or" in Sec. 26.0102(5), and that it should be construed as "and."

"In the construction of statutes, it is the duty of the court to ascertain the clear intention of the Legislature. In order to do this, courts are often compelled to construe 'or' as meaning 'and' and again 'and' as meaning 'or.' " Mr. Justice Grier in *United States v. Fisk*, 70 U.S. (3 Wall.) 445, 447, 18 L.Ed. 243, 244.

We hold that the Governor's granting a tax exemption on the initial capital investment in the plant and equipment only was a disapproval of the application of the plaintiff for a full tax exemption as specified in Sec. 26.0102(1). It could be nothing else. A quarter of a loaf is not a whole loaf.

The election of a President is a matter of great public interest. In that sentence the term "public interest" certainly means something different from what the same term means in the Industrial Incentive Act.

"Public interest" is a term with various meanings. It may mean one thing under one set of circumstances and another thing under another set of circumstances. This is apparent from the various judicial interpretations of the term as they appear in 35 Words and Phrases 229–240. It is a somewhat indefinite and ambiguous term.

"Resort to the preamble of a statute to aid in the construction of the enacting portion thereof is proper where an ambiguity exists. As sometimes expressed, it is the key to open the mind of the makers of the law. The preamble is especially helpful when the ambiguity is not simply that arising from the meaning of particular words, but such as may arise in respect to the general scope and meaning of the statute." 50 Am.Jur. 297–8.

■ We think that we may resort to the preamble (Purposes) of the Industrial Incentive Act in Sec. 26.0101 to aid us in its construction. A primary objective (purpose) of the Act as expressed by the Legislature is "to establish a firm foundation for self-government and to assist the people of American Samoa to attain the maximum possible self-support." We may consider the purposes (preamble) of the Act to determine what was in the mind of the Legislature when it provided that new businesses in the public interest might be granted a graduated tax exemption as provided in Sec. 26.0102 of the Act. We think that it "is the key to open the mind of the makers of the law." We think that "public interest" in the Act should be construed in the light of the Act's purposes as stated by the Legislature in Sec. 26.0101.

In its complaint the plaintiff alleged that the Governor by his letter (Exhibit D of Plaintiff's Complaint) of October 23, 1962 to the plaintiff "in review of the Tax Exemption Board's Memorandum (Exhibit C) and a Report from Plaintiff (Exhibit E) found and determined that the Bottling Corporation of Samoa was a new business and that its existence in American Samoa was not against the public interest." This allegation the defendant denied. This denial creates issues of fact.

■ The burden of proof was on the plaintiff as to these issues of fact. We think there is no doubt about the Governor's having determined that the plaintiff's business was a new business. It was for him to make a determination as to whether or not the plaintiff's business was in the public interest.

The plaintiff alleges in its complaint that the Governor has arbitrarily disregarded the "clear requirement of the law and his own findings." This allegation the defendant also denies.

510

■■■■■■ It is not our function to determine whether the plaintiff's business was or was not against the public interest. That was the function of the Governor.

Let us examine Mr. Carpenter's letter of October 16, 1962 to the Governor. It informs him, among other things, of the customs duties on the various ingredients going into Coca Cola. The Governor must have known that none of these ingredients, such as sugar, $CO_2$, chemicals and concentrate, are produced in American Samoa and that they would have to be imported. There was no point in Mr. Carpenter's informing the Governor of the customs duties on these items if they did not have to be imported. Also, it is a matter of common knowledge that none of them is produced in American Samoa, and we can take judicial notice of matters of common knowledge. 31 C.J.S. 824. Mr. Carpenter told the Governor by indirection that ingredients going into the beverage would have to be imported. Since Mr. Carpenter in the same letter informed the Governor that "we were finally appointed with the Coca-Cola franchise for Samoa," it follows that the Governor must have known that the plaintiff's business would be to sell its beverage to the Samoan people. The Governor's letter of October 23, 1962 shows that he knew that the ingredients would be imported.

The Governor must have known also from Mr. Carpenter's letter that the plaintiff would be selling its product, not a necessity (and we can take judicial notice of that fact, for it is common knowledge that Coca Cola is not a necessity) to American Samoans, taking a very substantial part of the money received from them for it and sending it out of the Territory to buy ingredients for making more Coca Cola. The Governor in his letter of November 16, 1962 to Mr. Carpenter said that he had considered "all of the known elements involved."

A primary purpose of the Industrial Incentive Act as set out in Sec. 26.0101 is "to establish a firm foundation

for self-government and to assist the people of American Samoa to attain maximum self-support," and "public interest" in Sec. 26.0103 should be interpreted in the light of these objectives.

■■■ Since the Governor considered, as he said, "all of the known elements involved," we think he must have asked himself this question: "Is a business which receives money from the Samoan people for a non-necessity and sends much of it out of the Territory a business not in the public interest?" And again we think he must have asked himself: "Will sending money received from Samoans for a non-necessity out of the Territory 'assist the people of American Samoa to attain the maximum possible self-support,' which is an objective of the Industrial Incentive Act as declared by the Legislature?" And again we think he must have asked himself this question: "If American Samoans spend money for a non-necessity, will they not have just that much less money to spend for the necessities of life, thereby rendering themselves less able 'to attain the maximum possible self-support?'" The Governor must have realized that the Bottling Corporation would not be bringing money into the Territory to pay out as wages to Samoan workmen except possibly some from sales in Western Samoa but on the other hand would be sending money out of the Territory drained off from the American Samoan economy for a non-necessity. Then we think he must, as an intelligent man, here asked himself the question: "Will the Samoan people be better able to support themselves as a result of this practice by the Bottling Corporation?" And finally, we believe the Governor must have asked himself this question: "Will it benefit the Samoan people to have their money drained off for a non-necessity and much of it sent out of the Territory?" We believe that the circumstances indicate that the Governor must have considered all of these matters when he was making up his mind as to whether or not he

512

would approve plaintiff's application for a full tax exemption as set out in Sec. 26.0102 of the Industrial Incentive Act. The Governor, as we have said, said that he considered "all the known elements involved." See the Governor's letter of November 16, 1962.

The plaintiff claims that the Governor found that the plaintiff's business was in the public interest because he stated in his letter of October 23, 1962 to Mr. Carpenter that "I have discussed the matter with certain members of the tax board and while I am reluctant to override the recommendation of that board I am willing partly to do so in order to get the new business into American Samoa and get it started." However, following this statement, the Governor in the same letter said:

"I am willing to grant tax exemption only on the initial capital investment in the plant and equipment. This would include tax on the building, plant, delivery vehicles, bottles and cases, office equipment, $CO_2$ cylinder, and vending machines and coolers. This exemption would apply on capital improvement items up to the first day of operation and would not apply to anything brought in thereafter. This tax would not include beginning inventory and raw materials which you would import."

This letter from the Governor clearly indicates that customs duties were not to be paid on the initial capital investment in plant and equipment. The plant and equipment would necessarily be brought in before any Coca Cola could be manufactured and sold to the Samoans. The initial plant and equipment would obviously not be paid for with money taken out of the Samoan economy for a non-necessity.

We note again that the Governor in his letter of October 23, 1962 to Mr. Carpenter said "This tax (the tax computed) would not include beginning inventory and *raw materials which you would import* (emphasis supplied)." In other words, the Governor exempted the initial plant and equipment to be paid for out of the corporation's capital,

513

or possibly in part with an outside bank loan, but refused to exempt anything already imported or to be imported which would be manufactured into Coca Cola and sold to the Samoan people.

It is *most significant* that he refused to exempt beginning inventory and raw materials to be imported while exempting initial plant and equipment. This is the key that opens up the Governor's mind to us. The initial plant and equipment would not be sold to the Samoan people and the money received therefor sent out of the Territory; the beginning inventory and raw materials to be imported would be sold to the Samoan people in the form of Coca Cola and much of the money secured from them for it would be sent out of the Territory.

This circumstance of dividing the plaintiff's imports into two classes, exempting the one from duty and not the other, points almost unerringly to the conclusion that the Governor determined that it was against the public interest to drain money out of the Samoan economy for a non-necessity and send much of it out of the Territory.

We think that under the circumstances the contents of the Governor's letter of October 23, 1962 is a clear indication that the Governor determined that the plaintiff's business was not in the public interest.

The fact that the initial plant and equipment would not be paid for with money procured from the Samoan people for a non-necessity may well have been the reason that the Governor exempted these items from import duties by giving a partial exemption.

▇▇▇ Mr. Carpenter said in his letter of May 10, 1962 to the Governor that the plaintiff would have five employees and the Tax Exemption Board said ten in its report to the Governor. It would have a few stockholders also. While the business would be in the interest of the handful of employees and also in the interest of the few stockholders

if the business made profits, nevertheless, the small number of employees together with the stockholders do not constitute the public.

There was no evidence that the Governor ever said, either orally or in writing, what he determined with respect to the plaintiff's new business being or not being in the public interest. We must make our finding of fact from the circumstances in this case.

It is true that the Governor said in his letter of October 23, 1962 that he was granting a partial exemption "in order to get this new business into American Samoa and to get it started." While the Governor might determine that the plaintiff's new business was not in the public interest as that term is used in the Industrial Incentive Act, he could still very well say at the same time that he would like to see it get started. The business was a perfectly legitimate one that would provide jobs for five or ten Samoans and possibly profits for a few stockholders, and the Governor could very well desire that the new business get started. Merely because a business might not qualify for a tax exemption does not mean that the Governor would not want to see it get started. Doubtless, many perfectly legitimate businesses do not qualify for tax exemption under the Industrial Incentive Act.

Counsel for the plaintiff has set out in his brief some apparently extemporaneous remarks which the Governor made to a legislative committee some two or three months after he had denied the plaintiff's application for a full tax exemption. These remarks were not introduced in evidence by the plaintiff. The Governor said that the plaintiff's business "would make a small contribution to our economy. Now maybe I was wrong in overruling the Board. I did this after a great deal of deliberation."

No doubt providing five or ten jobs might make a small contribution to the economy, but the Governor could well

515

consider that that would be a very small matter when weighed against sending substantial amounts of money gotten from the Samoan people for a non-necessity out of the Territory. The Governor made reference to the importation of soft drinks. However, since it would seem not to make much difference whether merchants exported money for soft drinks or the plaintiff did it for ingredients to go into its beverage, it is difficult to read into the Governor's remarks that he found that the plaintiff's business was in the public interest. However, these remarks, as we have said, were not introduced in evidence by the plaintiff, although plaintiff's counsel did mention them in his argument.

As we have already said, there was no evidence that the Governor ever said, either orally or in writing, what he determined with respect to the plaintiff's new business being or not being in the public interest. We have only circumstantial evidence on that matter. The fact that he denied the plaintiff's application for a full exemption is a strong indication of what his determination was.

Upon consideration of all the circumstances, we believe that the weight of evidence is to the effect that the Governor determined that the plaintiff's new business was not in the public interest, and we so find. It follows from this finding of fact that the plaintiff's petition should be dismissed.

 It is not necessary for us to determine whether we have authority to issue "a judgment and order in the nature of a Writ of Mandamus requiring the Governor to grant approval of the Plaintiff's application for tax exemption," as demanded by the plaintiff in its complaint. The question of approving or disapproving an application to the Governor for tax exemption is one requiring the exercise of judgment and discretion. However, "It is generally agreed that the courts have no right or power to interfere by mandamus with the governor on questions involving his judgment and discretion, and he cannot be compelled by mandamus to

perform duties which are partly discretionary and partly ministerial." 55 C.J.S. 203.

▮▮▮ The plaintiff demanded a declaratory judgment that "the Defendant, Governor H. Rex Lee, has an obligation under law to approve Plaintiff's application for tax exemption." Although it is also not necessary for a decision in this case, we note that "Since a declaratory judgment is of purely statutory creation, and unknown to the common law, . . ., in the absence of an authorizing statute a court cannot, either at law or in equity, entertain an action for, or render, a merely declaratory judgment declaring rights, obligations, or legal relations without awarding any remedial process; and this rule applied in the federal courts prior to the enactment of the federal declaratory judgments act." 26 C.J.S. 54. American Samoa does not have a statute authorizing declaratory judgments.

▮▮▮ Counsel for the Bottling Corporation asked the writer of this opinion ex parte in Chambers to enter an order, pending final determination of this case, that "the payment of taxes, customs duties and business license fees to the Government of American Samoa is hereby stayed." Later the Acting Attorney General objected to the entry of such an order. It is not believed that under the facts in this case such an order is authorized by the Federal Rules of Civil Procedure. The request was not conditioned upon furnishing a bond.

### DECREE

It is hereby ORDERED that the plaintiff's complaint be and it is hereby dismissed.

Costs in the sum of $35.00 are hereby assessed against the plaintiff, Bottling Corporation of Samoa, the same to be paid within 30 days.